## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Feb 06 2015, 10:07 am

CLERK
of the supreme court, court of appeals and tax court

ATTORNEYS FOR APPELLANT

Kyle C. Persinger
Scott J. Hunt
Spitzer Herriman Stephenson
Holderead Conner & Persinger, LLP
Marion, Indiana

ATTORNEY FOR APPELLEE

Joel K. Stein
Lynn and Stein, P.C.
Wabash, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re The Guardianship of
Samantha R. Barton

Harriet Barton,

*Appellant-Respondent,*[1]

v.

James P. Barton,

February 6, 2015

Court of Appeals Case No.
85A02-1403-GU-213

Appeal from the
Wabash Circuit Court

The Honorable
Robert R. McCallen, III, Judge

Cause No. 85C01-1304-GU-16

---

[1] We note that the caption on Harriet Barton's appellate brief identifies "Samantha Renee Barton, by next friend Harriet Barton" as being an additional appellant. Upon review of the proceedings below, we find that Samantha was not a named party in the trial court, nor did Mother request or receive permission to proceed as Samantha's "next friend" at any time. From the record before us, it appears that Mother, in her notice of appeal, unilaterally designated herself as next friend of Samantha, identified Samantha as a named party, and listed Samantha as an appellant on the caption of the briefs. Finding that this was inappropriate, we decline to consider Samantha as a separate party/appellant to this appeal. However, this decision does not affect our analysis of the issues raised, since Mother does not distinguish in her brief between her own arguments and those of Samantha.

*Appellee-Plaintiff*

## Kirsch, Judge.

After the trial court appointed James P. Barton ("Father") as guardian over his adult daughter, Samantha R. Barton ("Samantha"), Harriet Barton ("Mother") appeals and raises one issue with a number of subparts, which we restate as: whether Samantha was deprived of her due process rights during the guardianship proceedings, requiring us to reverse the trial court's appointment of Father as her guardian.

We affirm.

## Facts and Procedural History

Samantha was born in 1988 and is the adult daughter of Mother and Father, who were married for approximately ten years and dissolved their marriage in 1990. Samantha has cerebral palsy, as well as a developmental delay that often accompanies it. By all accounts, Samantha is a well-loved young lady, with a social, good-humored, talkative disposition. Samantha has a number of physical limitations because of the cerebral palsy, and she requires twenty-four-hour care. She has balance issues and mobility limitations, and she needs assistance if walking; sometimes she uses a walker and a gait belt to walk, other times she uses a wheelchair to get around. She has vision impairment and has limited ability with her left hand. Samantha also needs assistance with bathing.

[4]    Samantha's mental function has been described as being the equivalent of a child between the ages of six and thirteen years. She reads at an elementary school level, and while she is capable of learning, she is not expected to advance much beyond her current level. She will never be able to make enough money to support herself, and she cannot manage her own finances.

[5]    After the dissolution in 1990, Samantha resided with Mother and exercised regular and consistent visitation with Father. In 2008, Samantha graduated from Wabash High School, and thereafter, Mother and Father began sending Samantha to adult programming with Carey Services in Marion on some days so that Samantha could have structure and participate in activities. In May 2009, when she was almost twenty-one years of age, she began receiving social security disability payments, and those payments were made payable to Mother as payee. *Tr.* at 52, 385. Sometime in 2009, Mother consulted with an attorney and asked him to prepare guardianship papers appointing Mother as guardian over Samantha. Father did not agree to Mother being the sole guardian, suggesting that they be appointed co-guardians, but Mother did not agree to that arrangement. Neither party took further action at that time to establish a guardianship of Samantha. *Id*. at 412.

[6]    In May 2011, by agreement of Father and Mother, Samantha began living primarily with Father. She stayed with Father and his wife ("Stepmother") from Sunday afternoon through Friday evening or Saturday morning, and then Samantha would spend the weekends with Mother. There were no problems or issues with visitation or exchanges of Samantha during the time that Samantha

lived with Father. During this time, Samantha and her parents determined that Carey Services was not a good fit for Samantha, and, by agreement of the parties, Samantha began attending and receiving services from ARC of Wabash County ("ARC") in November 2011.

[7] This arrangement – living with Father during the week and Mother on the weekends – continued until early April 2013. On April 5, 2013, Father filed a verified petition for appointment of guardian over person and estate of incapacitated person. In the petition, Father sought appointment as Samantha's guardian, but proposed in the petition that Mother be named co-guardian, if she chose to do so. On April 7 or 8, 2013, Mother took Samantha for visitation as was the routine, but she did not return Samantha to Father's home. He did not see her for six weeks thereafter. On April 11, 2013, Mother filed an Acknowledgement with the trial court confirming that she had been served with the petition and the notice of hearing, and, about a month later, Mother filed a motion to dismiss Father's petition for guardianship, which the trial court later denied.

[8] On June 12, 2013, Father filed a petition for the appointment of a guardian ad litem. That day, the trial court entered an order appointing Stephanie Gottschalk ("Gottschalk" or "the GAL"), who was identified in Father's motion as an available and appropriate individual to serve as GAL. About a month later, Father filed an amended verified petition for appointment of guardian over the person and estate of incapacitated person, asking to be appointed as sole guardian of Samantha. Samantha, who was living with

Father at the time he filed his petition and living with Mother at the time he filed the amended petition, did not receive notice of Father's petitions.

[9]     On October 9, 2013, the GAL filed her home study evaluation report, which recommended that the trial court appoint Father as Samantha's guardian. Several months later, on January 17, 2014, Mother filed an objection and motion to strike the GAL report, and she asked the trial court to remove the GAL and to appoint a new GAL. That same date, the trial court denied the motion, finding "the Respondent has waived an objection to the appointment of Guardian which occurred more than 6 months ago." *Appellant's App*. at 5. On January 21, 2014, the GAL submitted an updated report to the trial court and the parties. The GAL stated that her "initial recommendations regarding guardianship and placement of Samantha remain unchanged." *Appellee's App*. at 35.

[10]    The hearing on Father's amended petition for guardianship commenced January 30, 2014, and continued two more days, February 11 and February 25, 2014. Mother and Father both appeared in person and by counsel. The GAL appeared in person. Samantha did not attend the hearings. At its core, the dispute stems from the fact that the parents do not share similar views on what is best for Samantha. Father alleges that a guardianship is necessary and that it is best for her to have daily structure and routine through a program such as ARC, which provides workshop services at the facility, where she can build things and interact with peers, as well as activities in the community. Father urges that Samantha is not capable of always determining what is in her best

interests. Father also asserts that Mother does not facilitate, and indeed impedes, his visitation with Samantha. Mother's position is that a guardianship is not necessary, as all of Samantha's needs are and have been satisfactorily met without a guardianship in place and that her attendance at Carey Services, currently one day per week, is meeting her needs. Mother maintains that Samantha is an adult and should be treated as an adult in many aspects, including allowing her to decide where to live, when to visit Father and for how long, and how often to attend programs and services. Both parties presented a number of witnesses, testimony, and evidence in support of their respective positions, including service providers, a counselor, a physician, and family members.

[11] According to the evidence presented, Samantha lived with her Mother from early April 2013, when Father filed the petition for guardianship, until about six weeks prior the hearing, at which time she began residing with her maternal grandmother ("Grandmother"), with whom Samantha had a close relationship all her life. Mother explained that Samantha began living with Grandmother because Mother had had knee surgery and needed help with Samantha's care, but even after Mother was well, Mother permitted Samantha to reside at Grandmother's house because Samantha told Mother she was happy there. The evidence further revealed that, despite his requests for visitation and time with Samantha, Father had visitation with Samantha on eleven occasions in the last year, including four overnights with Samantha in the six months prior to the hearing. Father presented evidence that his lack of time and visitation with

Samantha was due to Mother's and Grandmother's influence on Samantha and their unwillingness to make Samantha available. Father asserted that the visitation exchanges were often filled with drama and turmoil, which was very upsetting to Samantha. Mother, in turn, alleged that Samantha was old enough to decide where she wanted to go and if and when she wanted to visit with Father, and that it was appropriate to respect those wishes.

[12] After Samantha began living with Mother in April 2013, and without consulting Father, Mother changed Samantha's enrollment from ARC to Carey Services in Hartford City ("Carey Services"), where Samantha attended one day per week. Because the Carey Services facility in Hartford City was resolving state licensing issues, no services at the facility, such as workshops or other events, were offered or available. Instead, all services occurred out in the community, including activities such as regular volunteering at a nursing home. Father urges that the evidence at the hearing established that Samantha needs routine and consistency and that her attendance at ARC five days per week was better for her because it met her physical, social, and emotional needs. It exposed her to a peer group with whom she could and should interact, and it allowed her to work in a workshop on some of the days, and this gave her not only some money to spend, but also a sense of accomplishment and pride to be able to see that she had completed tasks. He maintained that having Samantha attend services only one day per week at Carey, as she was doing while living with Mother (or Grandmother), was detrimental to her because it created a

dependent environment, it was socially isolating, and her physical mobility was regressing and her weight was increasing.

[13] In addition to his own testimony, Father called as a witness Libby Waas ("Waas"), who was Samantha's case coordinator at ARC from November 2011 until March or April 2013. Waas worked with Samantha on a daily basis, and testified that Samantha thrived at ARC, and although she was reserved at first, she gained socialization and work skills. Samantha participated in the workshop at the facility, where she earned a nominal amount of money, but Waas emphasized that money was not the focus. Rather, the goals were to learn new skills, interact with peers, increase focus, and accept direction appropriately. Samantha also participated in activities outside of the ARC facility, out in the community, such as library visits. There were no issues with Samantha's attendance at ARC, although Waas testified that sometimes Mother or Grandmother would come early to pick up Samantha, often without calling ahead to notify the staff, or even desiring to stay on the premise, which ARC discouraged because it was not beneficial to fostering independence. Waas testified that Grandmother was not supportive of the ARC staff, even "nasty" sometimes. *Tr.* at 73. Waas also noted that Samantha's demeanor was different when she would come to ARC from Mother's house, seeming "less cheery" and "moody." *Id.* at 73-74. Quarterly meetings were held to discuss programs, plans, and goals for Samantha. Although Samantha attended the meetings, Waas stated that Samantha appeared not to grasp the meaning and purpose of the meetings and was disruptive "in a fun kind of way." *Id.* at 77.

Waas testified that the long term goal for Samantha was to prepare her to be able live the most productive life possible within her capabilities.

[14]  Also testifying for Father was Julie Sluss ("Sluss"), who was employed by Advocacy Links, a case management business that acted to oversee independent providers such as ARC and Carey Services. Sluss was Samantha's case manager at the time of the hearing, and had been since 2011, when Samantha began living with Father. While she felt Carey and ARC both offered acceptable programming for Samantha, Sluss testified that attending one day per week was not sufficient, opining that Samantha needed consistency and that five days per week was not too much for her. Sluss attended the quarterly progress meetings along with Samantha, her case coordinator, and her parents. Like Waas, Sluss testified that Samantha did not understand the purpose and did not participate in a meaningful way, sometimes being disruptive by playing on a cell phone or moving papers around, describing that Samantha was "not usually [] in tune to what we're talking about." *Id*. at 144. She indicated that Samantha needed structure and routine, consistent participation, and peer interaction, such that staying home with her Grandmother or Mother on most days was not in Samantha's best interest and did not provide Samantha with a support system outside of her family, which is preferred in order to prepare Samantha for the eventuality that she may outlive her parents. Sluss noticed that, since returning to living with Mother in 2013, Samantha curses more often and exhibits more childlike behaviors. Sluss

opined that Mother possessed "an unrealistic idea of Samantha's ability to make decisions for herself." *Id*. at 142.

[15] Among others, Mother called as a witness Joshua Loft ("Loft"), who was Samantha's more recent case coordinator at Carey Services. He testified that in the quarterly meetings Samantha was able to communicate her needs and wants and that she expressed her preference for community services, those where she interacted in the community, to those in a facility workshop setting. Loft testified that Samantha is "capable of making those decisions." *Id*. at 240. Mother also presented the testimony of Samantha's counselor, Jodi Reinke ("Reinke") of Still Waters Professional Counseling. Reinke began seeing Samantha in May of 2013 to assist with relationship conflicts that were troubling Samantha. Her goals were to help Samantha advocate for herself and verbalize and communicate her wishes. She described Samantha as sometimes silly, but insightful. *Id*. at 257. Reinke testified that Samantha has difficulty processing abstract issues, and she also observed that if Samantha is given too many options, she is overwhelmed.

[16] Mother also called Samantha's physician, Dr. Lori Fuqua ("Fuqua") to testify. She began seeing Samantha in May of 2013. Fuqua testified that, at the intake appointment, Samantha expressed that she was upset about her parents not getting along, and she told Fuqua that she did not want to live with Father. Fuqua described Samantha as having the mental capabilities of a child in the range of a nine to eleven years old.

According to several witnesses, Samantha is a pleaser, in that she desires to please whomever she is talking to at that moment, so that if Samantha is asked the same question more than once, she may try to change her answer to give the perceived right answer. Waas expressed concern that she was very influenced by Mother and Grandmother to the extent that she was submissive to them. Sluss likewise reported that, due to Samantha's level of functioning, she very easily is led to say what she thinks someone wants her to say.

The GAL's reports were admitted into evidence over Mother's objections. Her report concluded that both parents certainly love Samantha, have appropriate homes, and express a desire to put Samantha's best interest as the primary consideration. The GAL testified that she believed that the current arrangement of Samantha attending Carey Services one day per week was not sufficiently meeting Samantha's needs, but further stated attending five days per week may not be necessary, opining "I believe that there can be a compromise reached." *Id*. at 424, 436. The GAL testified that Samantha is able to make decisions regarding simple concrete issues, such as what cookie she would like or where she would like to shop, but she is not able to make decisions about abstract concepts such as what types of services, training, or programming she needs or is best for her because she does not understand the impact those decisions have on her life and the long term benefits and consequences of those decisions. The GAL indicated her belief that, without court intervention, and if left living with Mother and/or Grandmother, Samantha "will continue to have control over areas of her life that have a tremendous impact on her well being,"

but that Samantha "does not understand the impact of those decisions." *Appellee's App.* at 27; *Tr.* at 423. In light of this, the GAL recommended that Father be named Samantha's legal guardian.

[19] At the conclusion of the evidence, the trial court took the matter under advisement. Two days later, the trial court issued a detailed order, which granted Father's guardianship petition.[2] Among other things, the trial court stated:

> For a significant time after Samantha turned eighteen, she had frequent contact with both parents. Beginning in 2011, Samantha began living with [Father] during the week and visiting with [Mother] on the weekends. [Mother] agreed to this because she was unsatisfied with the services provided by Carey Services in Marion and wanted Samantha to participate in services through ARC of Wabash County. . . . During this time, Samantha had a routine. Samantha attended ARC five (5) days a week, she received therapeutic services and she earned money which she enjoyed spending. During this time, neither parent felt Samantha needed counseling and none was sought out. . . . Samantha blossomed during her time at ARC. . . .
>
> After the guardianship proceeding was filed, [Mother] changed the parties' arrangement and Samantha is now with her the vast majority of the time while [Father's] contact with Samantha has been significantly limited. [Mother's] actions were and are reprehensible. They are clearly vindictive. Further, [Mother] relies upon her mother, [Grandmother], to provide a significant amount of Samantha's care. When Samantha was at ARC, [Grandmother] was banned from there for being disruptive.

---

[2] We commend the trial court on the thoroughness of its order, which greatly assisted our appellate review.

. . . .

Arguably, Samantha's physical needs are being met. She has food, clothing and shelter. . . . [Father] wants to prepare Samantha for the future and the possibility she will outlive her parents. Part of his plan includes services through ARC.

If [Mother] continues to have her way, Samantha's contact with [Father], which is in her best interest, will continue to be severely curtailed, if not eliminated altogether. [Mother] did not even request [Father's] involvement when she made arrangements for Samantha to return to Carey Services. . . .

Samantha's ability to learn to be more independent has diminished in [Mother's] care. [Mother] manipulates Samantha to do and say as [Mother] desires. . . .

. . . .

The drama at exchanges between the parties is [Mother]-driven. . . . If [Mother] truly wants the exchanges to go better, she should encourage Samantha, not discourage her.

. . . .

Since Samantha has been in the primary care of [Mother] her physical mobility has diminished. She has also gained weight. Clearly [Father] encourages Samantha to walk as independently as possible and not to rely on her wheelchair as much as [Mother] allows. . . . According to [Mother], Samantha needs and is receiving counseling which apparently she did not need or receive when living with [Father].

[Mother's] credibility in these proceedings is dubious. . . . The Court finds her testimony, as well as [Grandmother's], suspicious. . . .

Also important is the Court's observation of [Mother] during the hearings. Her facial expressions when [Father] and his witnesses testified appeared condescending. She is in no way inclined to openly consider any options other than those she deems appropriate[.] . . .

For these reasons, the Court finds that the guardianship is in Samantha's best interests and is necessary as a means of providing necessary and essential care and supervision for Samantha. In fact, the guardianship is necessary to Samantha's overall well-being. . . . [Mother] provides Samantha with a dependent environment while [Father's] focus is on Samantha becoming more independent.

Granting [Father] guardianship is the only way the Court can ensure that Samantha's current physical and emotional needs are being adequately met and that she will have a significant and meaningful relationship with all members of her family and others which is clearly in her best interests and necessary for her well-being. . . .

*Appellant's App.* at 8-11. Mother now appeals.[3] Additional facts will be supplied as necessary.

# Discussion and Decision

[20] Indiana Code Section 29-3-5-3 provides that the trial court "shall appoint a guardian" if the trial court finds that: (1) the individual for whom the guardian

---

[3] Father argues that Mother failed to apply for permission to participate in the proceedings as is provided by Indiana Code section 29-3-5-1(f) and that, therefore, her "attempt to participate as a Respondent should be denied." *Appellee's Br.* at 24 (citing Ind. Code § 29-3-5-1(f), which states in relevant part: Any person may apply for permission to participate in the proceeding, and the court may grant the request with or without hearing upon determining that the best interest of the alleged incapacitated person or minor will be served by permitting the applicant's participation). Father is correct that Mother never requested permission to participate. However, the trial court recognized Mother as a respondent throughout the proceedings, and indeed, all parties operated under that premise. Under these circumstances, we decline Father's request to preclude Mother from appealing.

is sought is an incapacitated person or a minor; and (2) the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor. In guardianship proceedings, all findings and orders are within the discretion of the trial court. *In re Guardianship of Hollenga,* 852 N.E.2d 933, 936 (Ind. Ct. App. 2006). Accordingly, we review the trial court's order and findings for an abuse of discretion. *Id.* at 937. We will find the trial court has abused its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* The overriding consideration in selecting a guardian is the best interest of the incapacitated person or minor. *In re Guardianship of A.L.C.*, 902 N.E.2d 343, 360 (Ind. Ct. App. 2009).

[21] On appeal, Mother asks us to reverse the trial court's order granting Father's guardianship petition due to several procedural issues that, she claims, violated Samantha's due process rights. Specifically, she argues that Samantha was denied due process as a result of the following: (1) Father did not provide Samantha with notice of the guardianship petition as required by statute; (2) Samantha was not present for any of the three days of hearings on the guardianship; and (3) the GAL appointment was not properly made, the GAL did not represent Samantha's interests, and, therefore, the trial court should have appointed counsel to represent Samantha's interests at the hearing.

[22] Mother correctly asserts that Samantha was not served with notice as required by statute. Indiana Code section 29-3-6-1(a)(4)(A) requires that when a petition

for appointment of a guardian for an alleged incapacitated person is filed, a notice of the petition and the hearing on the petition shall be given to the incapacitated person whose whereabouts can be determined upon reasonable inquiry. Here, Father admits that he did not serve notice upon Samantha. He explains that, at the time he filed his initial petition for guardianship, in which he suggested he and Mother be appointed co-guardians, he held the belief and expectation that the guardianship "was a formality," and he was "totally surprised" by Mother's reaction to his request for a joint guardianship. *Appellee's Br.* at 14. He concedes, "[N]one of this excuses the failure to provide Samantha with notice," but maintains that Samantha's due process rights were not violated as a result of the lack of notice. *Id.* at 15. Mother maintains, however, that "[d]ue to the deficiency of lack of any notice being served on Samantha the trial court's awarding of a guardian over Samantha was inappropriate," and she asks us to reverse and remand for a new hearing. *Appellant's Br.* at 8.

[23] Initially, we observe that, under Indiana Code section 29-3-6-1(a)(4)(A), it was Samantha's right to receive notice, and Mother does not have standing to enforce that right. *See e.g.*, *In re Guardianship of Atkins*, 868 N.E.2d 878, 887 (Ind. Ct. App. 2007) (recognizing that right to be present at guardianship hearing belonged to incapacitated individual, and neither his life partner nor his parents had standing to enforce it), *trans. denied*. The trial court appointed a GAL "to represent the interests of [Samantha]," pursuant to Indiana Code § 29-3-2-3(a), and the GAL did not raise the issue of lack of notice to Samantha to

the trial court, nor did she file an appeal. Therefore, this issue has been waived. *Id*. However, even if we analyze it as Mother's right to enforce, we reach the same outcome. When Father initially filed his petition for guardianship in April 2013, Samantha was living with him, and when Father filed his amended petition in June 2013, seeking that he be appointed sole guardian, Samantha was living with Mother. Mother received the notices and attended the hearings. Mother could have raised the lack of notice and alleged violation of due process to the trial court, but did not. Rather, she is raising it for the first time on appeal. In such a case, we find that she has waived the issue. *Hite v. Vanderburgh Cnty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006) (where Father did not raise alleged violation of due process for lack of notice of CHINS proceeding until appeal from termination proceeding, Father waived issue on appeal).

[24]     Waiver notwithstanding, we examine Mother's claim and determine she is not entitled to relief. Other than making the assertion that Samantha did not receive notice as required by the statute, Mother has not pleaded any facts or provided any argument to explain her position that the lack of notice violated Samantha's due process rights. This court has recently confirmed that "there is 'no authority for the proposition that the failure to comply with the notice requirements of [Indiana Code section] 29-3-6-1 automatically invalidates an appointment of permanent guardianship.'" *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1198 (Ind. Ct. App. 2014) (quoting *Wells v. Guardianship of Wells,* 731 N.E.2d 1047, 1050 (Ind. Ct. App. 2000), *trans. denied*), *trans. denied*; *see also*

*Trook v. Lafayette Bank & Trust Co.,* 581 N.E.2d 941, 946 (Ind. Ct. App. 1991) (lack of notice of guardianship proceedings to proposed ward is waivable defect, which renders the guardianship proceeding voidable and not void ab initio), *trans. denied*.

[25]     The evidence at trial revealed that Samantha was considered to possess the reading level of an elementary school child. While the evidence was that she consistently attended the quarterly meetings at ARC and Carey Services with her parents, her case coordinator, and the case manager, Samantha did not participate in a meaningful way in those meetings. Although she has the capability of making simple, concrete decisions, she is not capable of processing more abstract concepts and making informed decisions on complex or abstract issues. Even if Samantha had received notice of the hearing, the evidence presented at trial indicates that, while she might have been able to read the words of the notice, she could not have comprehended the abstract concept of a legal guardianship and a hearing, and there is no evidence that she would have attended the hearing. A GAL was appointed to represent her interests, and she prepared a report based on numerous interviews and testified at the hearing. Various witnesses testified for both Mother and Father. We conclude that, under the facts of this case, the lack of notice did not amount to a due process violation.

[26]     In a related argument, Mother asserts that Samantha was not present at any of the three days of the guardianship hearings and that Indiana Code section 29-3-5-1(d) required her presence. As we determined with regard to the right to

receive notice of the petition and hearing, it was Samantha's right to be present at the hearing, and Mother does not have standing to enforce that right. *In re Guardianship of Atkins*, 868 N.E.2d at 887. Samantha had a court-appointed GAL to represent her interests, and the GAL did not request that Samantha be present. Consequently, this right has been waived. *Id.* (court-appointed GAL did not insist that incapacitated person be present at hearing and thus issue was deemed waived on appeal).

[27] Nevertheless, we turn to Indiana Code section 29-3-5-1, which, in pertinent part, states that a person alleged to be an incapacitated person "must be present at the hearing . . . unless the court determines by evidence" that:

> (2) it is not in the alleged incapacitated person's best interest to be present because of a threat to the health or safety of the alleged incapacitated person as determined by the court[.]

Ind. Code § 29-3-5-1(d)(2). Here, the trial court expressly recognized in its order as follows: "Samantha Barton was not present. The evidence clearly established that she is troubled by the conflict between her mom and dad. Based upon that evidence, her attendance was not in her best interests." *Appellant's App.* at 8. The statute permitted the trial court to make the determination that it was not in her best interest to be present, and our review of the record before us reveals ample support for the trial court's decision. Indeed, the counselor, physician, and Mother all indicated that Samantha was troubled by the current conflict between her parents. The trial court's determination that it was not in Samantha's best

interest to appear in court was supported by the evidence, and the trial court properly declined to require Samantha's presence at the hearing.

[28] Mother also raises a number of concerns about the GAL, including the manner of her appointment, her qualifications, and her alleged failure to represent Samantha's best interests such that the trial court should have appointed an attorney to represent Samantha. Indiana Code section 29-3-2-3(a) grants a trial court the authority to appoint a guardian ad litem for an alleged incapacitated person in guardianship proceedings. It states, in relevant part:

> [T]he court shall appoint a guardian ad litem to represent the interests of the alleged incapacitated person or minor if the court determines that the alleged incapacitated person or minor is not represented or is not adequately represented by counsel. If not precluded by a conflict of interest, a guardian ad litem may be appointed to represent several persons or interests. The court as part of the record of the proceeding shall set out its reasons for appointing a guardian ad litem.

Ind. Code § 29-3-2-3(a).

[29] On June 12, 2013, Father filed a verified motion for appointment of a guardian ad litem "to represent the interests of Samantha [] in this matter." *Appellant's App.* at 16. Father's motion identified Gottschalk as an available and appropriate individual to serve in the capacity of GAL, and that same day, the trial court appointed Gottschalk as GAL, ordering that she "shall act in that capacity as an officer of the court for purposes of investigating the relevant circumstances of this case." *Id.* at 19. Mother takes issue with the fact that Father's motion made "the specific request" for Gottschalk and that the trial

court granted it the same day without hearing, thereby implying that the trial court improperly named Gottschalk and that Gottschalk was biased in favor of Father. *Appellant's Br.* at 9. Initially, we observe that there is no requirement that the trial court have held a hearing, and there was no error in not doing so. Next, although Father's motion identified Gottschalk, the trial court obviously was not required to name her. Furthermore, there has been no evidence or suggestion that Gottschalk was anything other than objective in her investigation, reports, and testimony to the trial court. Mother did not file any objection to Gottschalk's appointment until January 17, 2014, which was eight months after the GAL's appointment, and three months after she filed her report, and about two weeks before the hearing. In her objection, Mother asked the trial court to remove Gottschalk and appoint a new GAL. The trial court denied Mother's motion the same day, finding that it was waived. Contrary to Mother's appellate claim, we find no error with the GAL's appointment.

[30] Mother further argues that Gottschalk was not qualified because she was not an attorney and did not have enough experience as a GAL. We disagree. First, Indiana Code section 29-3-2-3 does not require that the GAL be an attorney. Second, with regard to her experience, the record before us reveals that, although Gottschalk had been appointed as a GAL in "a couple" of guardianship cases, she possessed the following education and experience:

> I have a bachelor's degree in psychology from Purdue University, with an emphasis on child development and family studies. I worked, I did – I did volunteer work for CASA for several years. I worked at White's Family Services for fourteen years as a home-based family

therapist working with families that were at risk of losing their children or already had lost their children in the foster system. I worked on reunifying families. I taught parenting classes at White's through the (inaudible) parenting model. We did assessments, risk assessments on kids and on families. And I've done guardian ad litem work, started doing it a little bit in – around 2002 when my second child was born. So I just worked at White's for a while. And now I've been doing guardian ad litem work for the last seven years. I provide services here in Wabash County, in Miami County, in Fulton County, in Kosciusko County.

*Tr*. at 427. Reviewing the above credentials, we are satisfied that Gottschalk was suitably qualified.

[31] Mother also claims that the GAL did not represent Samantha's best interests, asserting that she did not offer evidence, cross-examine witnesses, or ask Samantha about her wishes regarding guardianship or where she wanted to live. The trial court's order appointing the GAL directed that she "shall act as an officer of the court for purposes of investigating the relevant circumstances of this case." *Appellant's App*. at 18. It further ordered that the GAL make available to counsel or any party not represented, the GAL's file of underlying data and reports, complete texts of diagnostic reports made to her, and the names and addresses of all persons with whom she consulted. *Id*. Pursuant to that order, the GAL thereafter met with and interviewed thirteen individuals, including Samantha's counselor and case worker, and she also reviewed records, text messages, and voice mails between Mother and Father. She filed a thirty-page home study evaluation in October 2013, which was over two months before the January 30, 2014 hearing, giving the court and parties ample

time to review and digest the report, and she filed an updated report on January 21, 2014, so that the trial court and the parties would have her most recent recommendations. There is no evidence that she was not thorough or objective in her analysis or findings. The GAL was present at all three days of hearings, testified on the last day, and was examined by counsel for both Mother and Father. Mother challenges the fact that the GAL did not offer separate evidence or cross-examine witnesses. The GAL had already met with a number of the witnesses who appeared and testified at trial, and her report already reflected their discussions and information they shared with her. In any event, nothing in the statute or her appointment required her to cross-examine witnesses at the hearings or offer evidence beyond her evaluation or report. Mother argues that the GAL failed to ask Samantha where she wanted to live, or her wishes about the guardianship. However, the GAL explained that it is her practice not to "ask[] a child where they want to live." *Tr.* at 443. Mother has failed to persuade us that the GAL did not represent Samantha's interests, and we decline her request to order the trial court to appoint an attorney for Samantha.[4]

[32] We conclude that none of the alleged due process violations, either individually or cumulatively, warrant a reversal of the trial court's guardianship appointment.

---

[4] Indiana Code section 29-3-5-1(c) permits, but does not require, a trial court to appoint an attorney to represent an alleged incapacitated person after a petition for guardianship is filed.

Affirmed.

Friedlander, J., and Crone, J., concur.