# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**THERESA M. WILLARD**
**JOSH S. TATUM**
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

**KARA REAGAN**
Stafford Law Office, LLC
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**DONALD W. FRANCIS, JR.**
**FRANCIS BERRY DOMER**
Bloomington, Indiana



FILED
Feb 18 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF J.L.J. and J.D.J., Minor Children, | ) ) ) |
| J.J., | ) ) |
| Appellant-Respondent, | ) ) |
| And | ) ) |
| T.H., | ) ) |
| Appellant-Intervenor, | ) ) |
| vs. | ) No. 53A01-1306-AD-285 ) |
| D.E., | ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1109-AD-77; 53C07-1109-AD-78;
53C07-1109-GU-126; & 53C07-1109-GU-127

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

In this consolidated appeal, Appellant-Respondent, J.J. (Father), and Appellant-Intervenor, T.H. (Grandmother), appeal the trial court's Order dispensing with Father's consent to the adoption of his two minor children and denying Grandmother's petitions for guardianship and adoption of her grandchildren in favor of Appellee-Petitioner, D.E. (Guardian).

We affirm.

ISSUES

Father raises two issues on appeal, one of which we find dispositive and restate as the following: Whether the trial court erred in finding that Father's consent to Guardian's adoption of the Twins was not required based on Father's failure to provide support.

Grandmother raises three additional issues, which we restate as the following:

(1) Whether the trial court erred in concluding that Grandmother was not entitled to receive notice that Guardian had filed petitions for guardianship;

(2) Whether the trial court erred in failing to comply with the Interstate Compact on the Placement of Children (ICPC); and

(3) Whether the trial court abused its discretion in denying Grandmother's petitions for appointment as the Twins' guardian and for their adoption.

2

FACTS AND PROCEDURAL HISTORY

On Thanksgiving Day of 2008, Grandmother was introduced to J.S. (Mother)[1] while at the home of a mutual friend. Grandmother wanted to help Mother, who was then seventeen years old and had a young child. Shortly thereafter, seventeen-year-old Father met J.S. at Grandmother's home in Benton Harbor, Michigan. Since that time, they have been involved in an on-again, off-again relationship. Their relationship has produced four children, including the twins at the center of this appeal, J.L.J. and J.D.J. (Twins).[2] Father also has two other children from a different relationship.

In June of 2010, Mother resided in South Bend, Indiana. She was visiting Father in Benton Harbor on June 7, 2010 when she prematurely went into labor. Shortly after birth, the Twins were transferred from Benton Harbor to a better-equipped hospital in South Bend, where they remained for approximately one month. On July 12, 2010, Mother took the Twins home from the hospital, but with four children under two years of age, she had "little interest in caring for the [Twins]." (Appellants' App. p. 75). A few weeks later, Mother left the Twins with her cousin, J.B. (Cousin), who also lives in South Bend.

Throughout Mother's pregnancy and during the first year-and-a-half of the Twins' lives, Father was incarcerated at various intervals and for different reasons, including a four-month stint for battering Mother. At some point in the fall of 2010, Father and Mother

---

[1] On January 28, 2013, the trial court granted Guardian's motion for summary judgment as to Mother, concluding that her consent to the Twins' adoption was not required. Mother was incarcerated during the bench trial and is not a party to this appeal. Facts pertaining to Mother have been included where appropriate.

[2] Mother and Father's oldest child together, born in October of 2009, and their youngest child, born in March of 2013, are not part of this appeal.

removed the Twins from Cousin's care and lived together in South Bend to "try parenting together." (Grandmother's Br. p. 5). However, they soon separated. Father and Mother's on-again, off-again periods were short and frequent, and following each break-up, Mother would leave the Twins with a relative or family friend. Between the end of 2010 and September of 2011, a number of different people cared for the Twins for varying lengths of time. In addition to sporadic stays with Mother, the Twins were shuffled among Cousin, Grandmother, the Twins' maternal grandmother (D.S.), and Mother's former foster mother (L.B.).[3] Father spent time with the Twins when they were with Mother or Grandmother, but he otherwise did not play a significant role in their care and custody.

On June 28, 2011, Father returned to jail. While serving time in the Berrien County Jail (Michigan), on July 6, 2011, the St. Joseph County (Indiana) probate court issued an order establishing Father's paternity as to the Twins. The probate court found that "Indiana is the home state of the [Twins,]" and that "Father resides in St. Joseph County, Indiana or has sufficient ties to Indiana." (Guardian's Exh. 1). The probate court awarded sole custody to Mother and ordered that the Twins' surnames be changed to that of Mother rather than Father. Mother was given the discretion to allow parenting time for Father in accordance with the Twins' best interests. Finally, the probate court ordered Father to pay $26.00 per week in child support and $4.00 per week in arrearages.

---

[3] The briefs and testimony of the involved parties and other witnesses are so convoluted and inconsistent that this court was unable to piece together a coherent timeline of the Twins' placements leading up to Guardian's filing of the petitions for guardianship and adoption.

The Twins spent a significant portion of the summer of 2011 with Grandmother in Benton Harbor, and Mother took them back and forth on several occasions for appointments and other visits. However, after hearing a rumor that Father would be incarcerated for five years, Mother began seeking someone to take the Twins on a permanent basis. In August of 2011, Mother picked the Twins up from Grandmother's home, explaining that she was taking them to South Bend to see family and that she would return them in one week. Mother never returned the Twins to Grandmother. Instead, Mother placed them with her former foster mother, L.B., and demanded that Grandmother mail her their birth certificates and social security cards.

On September 11, 2011, D.S., the maternal grandmother, was having dinner with her sister-in-law and her sister-in-law's friend, Guardian. Upon learning that Guardian had been attempting to adopt children for several years, D.S. informed Guardian about Mother and the Twins. Guardian made contact with Mother, and on September 17, 2011, Guardian drove from her home in Bloomington, Indiana to Mother's home in South Bend. Along with Mother and her other children, D.S. and Cousin were also present when Guardian arrived. Mother informed Guardian that Father was incarcerated and had only ever had limited contact with the Twins. Although this was the first time Guardian and Mother had ever met, they discussed Guardian's adoption of the Twins, and Mother signed a consent form for Guardian to be named the Twins' guardian. That day, Guardian took the Twins home with her to Bloomington, where they have since resided.

On September 29, 2011, Guardian filed petitions with the trial court for appointment as the Twins' guardian and also filed petitions to adopt the Twins.[4] On October 3, 2011, notice of the guardianship hearing was issued to Father. On October 6, 2011, Father received two summons notifying him that Guardian had filed adoption petitions, which explained that Father had thirty days to file a motion to contest the adoption, or his consent would "be irrevocably implied and you will lose your right to challenge either the adoption or the validity of the implied consent to the adoption. You will lose your right to establish paternity of the child." (Guardian's Exh. I, p. 225). On November 15, 2011, the trial court conducted a hearing and appointed Guardian as permanent guardian over the Twins pending finalization of an adoption. Neither Mother nor Father were present during the hearing. On December 16, 2011, approximately one week after his release from jail, Father wrote a letter to the trial court, requesting that the Twins be placed with Grandmother and that he be granted a six-month extension to contest the adoption. On February 16, 2012, Father filed his official motion to contest Guardian's adoption of the Twins.

On March 15, 2012, Grandmother, acting *pro se*, filed a motion to intervene in the adoption cases and simultaneously filed cross-petitions to adopt the Twins. On March 27, 2012, the trial court conducted a hearing, during which it granted Grandmother's motion to intervene and advised her to retain counsel. On May 1, 2012, Grandmother also filed a motion to intervene in the guardianship proceedings, and Mother filed her consent to

---

[4] This appeal stems from four separate cases—an adoption petition and a guardianship petition was filed for each Twin. The trial court combined proceedings as the issues and parties all overlapped, but it did not consolidate the cases.

6

Grandmother's adoption of the Twins. On June 6, 2012, Grandmother filed motions to remove Guardian as the Twins' guardian and for her own appointment in lieu thereof. Grandmother insisted that she "is the most suitable person to serve as guardian for the minors . . . because she was their primary caregiver for eight or nine months of their lives, she is their grandmother, both of their parents want the [T]wins in her care, and she will allow them to see their parents to the extent that it is in their best interests." (Appellants' App. p. 175).

On July 10, 2012, Guardian filed a motion to dismiss Grandmother's adoption petitions, alleging Grandmother had failed to comply with the ICPC. (Appellants' App. p. 62). In response, on September 14, 2012, Grandmother filed a motion for partial summary judgment, contending that the placement of the Twins with Guardian violated the ICPC. Treating Guardian's dismissal motion as one for summary judgment, the trial court found existing issues of material fact regarding "the events leading to the placement of the children with [Guardian]" and accordingly denied summary judgment as to both parties. (Appellants' App. p. 67).

Also on July 10, 2012, Guardian filed a motion for declaratory or summary judgment, alleging that Father had irrevocably implied his consent to the Twins' adoption by failing to contest the adoption within thirty days of receiving notice. Guardian amended this motion on October 3, 2012, adding that Father's consent was not required based on his failure to support the Twins. Because Father had previously established paternity but Guardian had erroneously used the form required to provide notice to an unnamed putative

7

father, and because the trial court found genuine issues of material fact regarding Father's failure to support the Twins, the trial court denied Guardian's summary judgment motion.

On January 22 and February 26, 2013, the trial court conducted a bench trial on the matters of Father's consent, Grandmother's petitions to remove Guardian as the Twins' guardian, and Grandmother and Guardian's cross-petitions for adoption. In a single Order issued on April 19, 2013, the trial court concluded that Father's consent to the Twins' adoption was not necessary based on his failure to provide support for the Twins for at least one year and for failing to contest the adoption within thirty days of receiving notice; denied Grandmother's petitions to remove Guardian and for Grandmother's successive appointment as guardian; and denied Grandmother's petitions for adoption, finding that it would be in the Twins' best interest to be adopted by Guardian. The trial court issued findings of fact and conclusions of law and set a date for the final hearing regarding Guardian's adoption of the Twins.

On May 20, 2013, Father filed a motion for certification for interlocutory appeal or, alternatively, for directed entry of judgment. On May 21 and 22, 2013, Grandmother filed her notices of appeal in the adoption and guardianship cases, respectively. On June 17, 2013, the trial court signed an order stating that the Order issued on April 19, 2013 is the final judgment as to all parties, and on July 1, 2013, Father filed his notices of appeal in the adoption proceedings. The trial court stayed the final adoption hearing pending appeal. On July 26, 2013, we granted Grandmother's motion to consolidate the guardianship and adoption cases for appeal.

8

Father and Grandmother now appeal. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standards of Review*

A. *Adoption Proceedings*

When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. *Rust v. Lawson*, 714 N.E.2d 769, 772 (Ind. Ct. App. 1999), *trans. denied*. We will not disturb the ruling of the trial court "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *Id.* at 771. In determining whether the trial court's decision is supported by sufficient evidence, we do not reweigh the evidence, and we consider all evidence and reasonable inferences derived therefrom most favorably to the trial court's ruling. *Id.* In cases where an adoption petition is filed without the required parental consent, the party seeking to adopt "bears the burden of proving the statutory criteria for dispensing with such consent . . . by clear, cogent and indubitable evidence." *Id.*

B. *Guardianship Proceedings*

In guardianship proceedings, all findings and orders are within the discretion of the trial court. *In re Guardianship of Hollenga*, 852 N.E.2d 933, 936 (Ind. Ct. App. 2006). Accordingly, we review the trial court's findings for an abuse of discretion. *Id.* at 937. We will find the trial court has abused its discretion only if its decision "is clearly against the logic and effect of the facts and circumstances before the court, or if the court has

9

misinterpreted the law." *Id.* We will review any questions of law *de novo*, owing no deference to the trial court's legal conclusions. *Id.*

## II. *Father's Failure to Support the Twins*

Father claims that the trial court erred in determining that his consent to the Twins' adoption was not necessary based on his failure to financially support his children from birth up until his incarceration in June of 2011. Under Indiana law, a parent's consent to the adoption of his child is not required if

> for a period of at least one (1) year the parent:
> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

Ind. Code § 31-19-9-8(a)(2). A parent's failure to support may have occurred during "any year in which the parent had an obligation and the ability to provide support, but failed to do so." *In re Adoption of J.T.A.*, 988 N.E.2d 1250, 1255 (Ind. Ct. App. 2013), *reh'g denied*.

In the July 6, 2011 order establishing paternity, the St. Joseph County probate court ordered Father to pay $26.00 per week in child support, retroactive to the Twins' date of birth. The parties do not dispute that Father has never paid any support. During the bench trial, Father testified that he was unaware of the paternity determination or that he had been directed to pay support, but it is well settled that parents have a duty to support their children regardless of a court mandate to pay. *See In re Adoption of N.W.*, 933 N.E.2d 909, 914 (Ind. Ct. App. 2010), *opinion adopted*, 941 N.E.2d 1042 (Ind. 2011). Thus, Guardian must prove by clear and convincing evidence that Father had the *ability* to support the Twins and failed to do so. *McElvain v. Hite*, 800 N.E.2d 947, 950 (Ind. Ct. App. 2003).

10

In its findings of fact and conclusions of law, the trial court stated that "[t]he evidence demonstrates that [Father] has not provided care and support for his children at any time during their lives. The evidence is sufficient to demonstrate that [Father] was physically capable of working and providing for his children, but chose not to provide support." (Appellants' App. p. 86). Additionally, the trial court found no credible evidence to demonstrate that Father is disabled or that he receives Social Security disability payments.

At trial, Father testified that he has never been employed and that his only source of income has been Social Security disability payments, which he has received since childhood with the exception of a period between April 1, 2010 and October 1, 2012. Father explained that his disability is based on a diagnosis of attention deficit hyperactivity disorder (ADHD). While this is the only condition that Father could identify, he testified that his mother would know his complete list of diagnoses. Father now contends that, "[n]ot only did [Guardian] fail to show that Father had regular and consistent income that allowed him to pay child support, she failed to demonstrate that he had any income at all." (Father's Br. pp. 14-15). He argues that Guardian failed to demonstrate his ability to pay because his testimony "that when he was not receiving Social Security disability between April 2010 and October 2012, he lived in shelters, or with family" is undisputed. (Father's Br. p. 4). We disagree. While it is true that Guardian did not offer documentation of Father's financial resources, we must consider the totality of the circumstances in determining the ability of a parent to support his child. *In re Adoption of M.A.S.*, 815 N.E.2d 216, 221 (Ind. Ct. App. 2004). *See In re Adoption of K.F.*, 935 N.E.2d 282, 288

11

(Ind. Ct. App. 2010) (citing income stability and reasonable expenses as considerations of parent's ability to pay), *trans. denied*.

According to Father, his disability payments were cut off two months prior to the Twins' birth and were not reinstated until the Twins had been living with Guardian for over one year. Father's contention that he was "broke" without this assistance is inconsistent with his claim that he supported the Twins by purchasing car seats, diapers, and formula. (Transcript p. 698). The trial court found that Grandmother actually purchased the car seats. Additionally, both Grandmother and Father testified that, even when the Twins were staying in Grandmother's home, Father was able to afford his own residence in Benton Harbor, and he had funds to purchase cigarettes and travel back and forth between Benton Harbor and South Bend. *See, e.g., Irvin v. Hood*, 712 N.E.2d 1012, 1014 (Ind. Ct. App. 1999) (finding father "offered no legitimate reason why he was unable to provide even minimal support for his child" even though he "was financially able to travel abroad"). Furthermore, Father never claimed that he was unable to afford the support payments; instead, he testified:

> From my understanding[,] they told me that I wasn't suppose[d] to pay, I don't care about paying it[,] but if the social security office has told me that I don't pay child support then that's what I go by. So if I'm paying or if I owe[,] I didn't know you know what I'm saying.
>
> * * * *
>
> . . . I swear I did not have no, I never thought cause the social security office said I don't have to pay. So I don't gotta pay that's what I'm thinking. It's no problem because I was still providing like [P]ampers, the car seat, that was child support. Uh, the milk um, before her [WIC,] because when a child first come out of the hospital they give you a certain amount of milk to provide the child until you get a[n] appointment to get more milk. So I did buy cans of formula, milk you know what I'm saying for my child. But I

12

wasn't paying child support because I felt like as long as I'm taking care of them or giving them what they needed and then they said that I don't pay so and then I, and then I was thinking in my mind like you all are telling me not to take care of my kids. But then somebody had to tell me like no they're not saying that you just do it out of your own pocket. Ain't no such thing as no this and that.

(Tr. pp. 667-68). Thus, Father admitted that he intentionally did not pay support based on his belief that he was satisfying his obligation by "taking care of" the Twins. (Tr. p. 668). The trial court, however, found "no credible evidence that [Father] provided the [Twins] with care and support." (Appellants' App. p. 86). *See In re Adoption of K.F.*, 935 N.E.2d at 288 (finding mother's inability to work due to bipolar disorder was insufficient to demonstrate her inability to pay support after she admitted in contempt orders that she knowingly and intentionally failed to pay her child support obligation").

Father also claims that the trial court erred in finding that he was capable of working by considering only whether Father is physically, rather than mentally, disabled. According to Father, "neither Father nor any other witness []ever testified that his mental status would allow him to hold a job." (Father's Br. pp. 13-14). When asked if his disability prevented him from working, Father answered that "[t]hey told me that I don't need to work. The [j]udge told me that. I don't know why." (Tr. pp. 699-700). However, Father subsequently clarified that he could work:

Q: Okay um, and they've told you [that] you don't need to work[?]
A: Well I'm not gonna to say…

* * * *

A: …that he said that but I'm just gonna say that he said that basically, he didn't never say I need to work[,] he just said you'll get disability for the rest of your life cut it short.
Q: You get disability.

13

A:    That's it.

Q:    Alright. Do you, is there anything physically that, that keeps you from.

A:    Yeah, yeah my leg man I um, I don't know if I can show it or not but um, yeah I have uh, injured my leg probably about three years ago playing basketball I was going out for a trial, I was trying to be a basketball player what[ ]ever. I broke my leg, I broke the main, I broke the, the whole leg man the bone in the front, the bone in the back and I got a big knot over it right now to this day.

Q:    Okay. I mean you can still walk and it's just…

A:    And limp. Limp.

\* \* \* \*

A:    And sometimes it will go out on me if I stand up too long it'll like make me go down a little bit.

Q:    Okay is it um, I mean is it possible you could do some manual labor at, if you sat at desk and just…

A:    Uh, yeah I could.

Q:    …move parts, you could do that stuff[?]

A:    I probably could I know, but I don't know. But I just can't play basketball no more.

(Tr. pp. 715-16). Father also testified that his disability payments were stopped in April of 2010 based on Social Security's finding that he was *not* disabled. Thus, in determining that Father was capable of working and providing for the Twins, the trial court considered evidence that Father admitted his ability to work, that Father has difficulty with reading and comprehension, and that he has been diagnosed with ADHD. It is not the role of this court to judge the credibility of witnesses, and we decline Father's invitation to reweigh evidence in order to find that he was precluded from working due to a mental disability.

Therefore, while Guardian may not have documented Father's actual income, there is sufficient evidence that Father, although apparently capable of financing his own independent living, failed to provide for the Twins "to the best of [his] ability." *In re Adoption of N.W.*, 933 N.E.2d at 914. Father chose not to pursue employment when his

14

disability payments were discontinued for a year and a half, only spent occasional time with the Twins when they were with Mother or Grandmother, and did nothing to ensure that the Twins were consistently equipped with adequate "housing, clothing, food, and other necessities." *Id.* *See In re Adoption of A.M.K.*, 698 N.E.2d 845, 847 (Ind. Ct. App. 1998) (finding the trial court reasonably concluded that the father had knowingly failed to support his child where the father had chosen "to be voluntarily unemployed" and had "made no claim that he was unable to work or that he suffered an impairment that prevented him from working"), *trans. denied.* Accordingly, we find sufficient evidence supports the trial court's determination that Father's consent was not required based on his knowing failure to provide care and support for the Twins despite an ability to do so.[5]

III. *Grandmother's Claims*

A. *Notice of Guardianship Proceedings*

Grandmother claims that the trial court's appointment of Guardian as the Twins' guardian is invalid because Guardian failed to provide Grandmother with notice. Specifically, Grandmother contends that "[t]he [trial] court refused to find who the principal caregiver was before August 1, 2011, and [Grandmother] undoubtedly has alleged to have played that role for the twins, which is all that is required by the statute." (Grandmother's Br. p. 14). When an individual petitions the court to be appointed as guardian over a minor, notice of the petition and hearing must be mailed to any living

_____

[5] Because we conclude that Father's consent was not required based on his failure to support the Twins, we need not address Father's alternative argument that the trial court erred in concluding that Father's consent was unnecessary based on his failure to contest the adoption within thirty days of receiving deficient notice.

parent of the minor whose parental rights have not been terminated, "[a]ny person alleged to have had the principal care and custody of the minor during the sixty (60) days preceding the filing of the petition[,]" and anyone else that the trial court deems is entitled to notice. I.C. § 29-3-6-1(a)(3). "Notice is not required . . . if the person to be notified . . . appears at the hearing on the petition." I.C. § 29-3-6-1(a).

Guardian filed the guardianship petitions on September 29, 2011 and was appointed as the Twins permanent guardian on November 15, 2011. Father received notice, but neither he nor Grandmother attended the hearing. In its Order, the trial court concluded that Grandmother "failed to establish that she was entitled to notice of the guardianship proceedings." (Appellants' App. p. 78). Specifically, the trial court noted,

> The evidence does not establish that [Grandmother] had the principal care and custody of [the Twins] during the sixty days preceding the filing of the petition. The [Twins] had been in the care of [L.B.] since approximately August 1, 2011. Prior to this, the [Twins'] exact location is not known. Further, there is no evidence that [Guardian] was aware that the [Twins] were alleged to have been in the care of [Grandmother] during the sixty days preceding the filing of the petitions for guardianship.

(Appellants' App. p. 78). We agree.

A review of the record indicates that the Twins probably spent a great deal of time with their Grandmother in Benton Harbor; however, they also spent a great deal of time with various relatives and family friends in Indiana. The Twins' *Guardian Ad Litem* (GAL) agreed that the Twins' placement during the first fifteen months of their lives was "spotty." (Tr. p. 276). Grandmother testified that Mother "was always coming back and forth[,] back and forth" and that her "door was always open to [her] grandkids." (Tr. p. 847). A forty-seven mile drive from South Bend to Benton Harbor, Grandmother explained that Mother

16

routinely shuttled the Twins back and forth for appointments or to spend multiple nights with Mother. Grandmother told Mother that she "was fine just keeping the kids on and off[,]" but if Mother wanted Grandmother "to be their permanent caregiver[,]" Grandmother would need to go through the proper legal channels first. (Tr. pp. 860-61). Furthermore, Grandmother asserts that the Twins were in her care until August 28, 2011, but the trial court found that Mother had removed the Twins from Grandmother's by August 1, 2011. Relying on the trial court's factual determination, the Twins were only in Grandmother's care for one day of the sixty that preceded Guardian's petitions. Even were we to consider Grandmother's argument that the Twins lived with her until August 28, the Twins would still have been in her care for less than thirty days of the sixty days preceding the filing of the guardianship petitions. Thus, the evidence does not support a finding that Grandmother was the Twins' *primary* caregiver and entitled to notice.

Notwithstanding our determination that Grandmother was not the primary caregiver, our court has previously established that there is "no authority for the proposition that the failure to comply with the notice requirements of [Indiana Code section] 29-3-6-1 automatically invalidates an appointment of permanent guardianship." *Wells v. Guardianship of Wells*, 731 N.E.2d 1047, 1050 (Ind. Ct. App. 2000), *trans. denied*. At the time she filed the guardianship petitions, Guardian had no basis for knowing that Grandmother was an alleged caregiver, but Guardian did provide notice to Father based on his available information. The record establishes that Guardian arranged to take the Twins by communicating with Mother. When she picked the Twins up at Mother's house in South Bend, Mother's other children, D.S., and Cousin were all there as Mother informed

17

Guardian that she had nobody else to take the Twins. Because Guardian received the Twins directly from the custodial parent and was provided with their birth certificates, social security cards, and Medicaid cards, she had no indication of Grandmother's involvement. Thus, Guardian "did not intentionally attempt to conceal the guardianship proceedings from [Grandmother]." *Id.* at 1051. Accordingly, we find the trial court did not abuse its discretion in concluding that Grandmother was not entitled to notice of the guardianship proceedings.

### B. *Interstate Compact on the Placement of Children*

Next, Grandmother claims that Guardian's guardianship appointment is invalid because the trial court failed to adhere to the requirements of the ICPC. The ICPC facilitates the interstate placement of children and resolves jurisdictional issues. *See* I.C. § 31-28-4-1. Prior to placing a child in a home or childcare institution located in another state, the person or agency in the "sending" state must submit written notice to the appropriate authorities in the "receiving state" to provide information about the child and the proposed placement, as well as the reasons necessitating the placement. I.C. § 31-28-4-1 art. III(a)-(c). In turn, the receiving state must notify the sending state "that the proposed placement does not appear to be contrary to the interests of the child." I.C. § 31-28-4-1 art. III(d).

The trial court did not make any findings of fact or conclusions of law regarding the applicability of the ICPC, but it did find that "[a]ll available records show that the [Twins] have always been residents of the [S]tate of Indiana." (Appellants' App. p. 75). Both Grandmother and Guardian make respective arguments concerning whether the Twins'

18

residency should be construed as Michigan or Indiana. The parties agree that the Twins were born in Benton Harbor, were transported to a hospital in South Bend shortly thereafter, went home from the hospital with Mother, and spent the first several months of their life in South Bend in either the care of Mother or Cousin. Furthermore, although there is significant disagreement regarding the perpetual reshuffling of the Twins during the year prior to their placement with Guardian, the parties do not dispute that it was Mother who would remove the Twins from one caretaker and transfer them to another.

Article VIII of the ICPC specifically states that the ICPC does *not* apply in situations where a parent takes her child into a different state "and leav[es] the child with any such relative or nonagency guardian in the receiving state." In this case, the domicile state of the Twins or the length of time they lived with Grandmother is irrelevant because it was Mother—without agency involvement, nor as the result of a court order—who picked the Twins up in Benton Harbor, drove them to South Bend, and authorized Guardian to take them to Bloomington with a signed consent for their guardianship. *See In re Adoption of M.L.L.*, 810 N.E.2d 1088, 1093 (Ind. Ct. App. 2004). We thus conclude that the trial court did not err in appointing Guardian as guardian because the ICPC does not govern Mother's placement of the Twins' with Guardian.

## C. *Adoption Petition*

Finally, Grandmother claims that the trial court abused its discretion in denying her petitions to remove Guardian and for her adoption of the Twins, finding instead that their best interests would be served by permitting Guardian to adopt them. After hearing evidence, a trial court shall grant an adoption petition and enter a decree of adoption if the

19

trial court finds that all required consents have been given, that adoption would be in the child's best interests, and that the prospective adoptive parent is capable of "rear[ing] the child and furnish[ing] suitable support and education." I.C. § 31-19-11-1(a). A child's best interest "is the paramount concern in any adoption case." *In re Adoption of S.A.*, 918 N.E.2d 736, 742 (Ind. Ct. App. 2009), *trans. denied*. Relying on the factors set forth in the adoption statute, "[t]he trial court is solely responsible for making the determination of what is in the best interest of the child." *Id.*

Here, the trial court cited numerous reasons for its decision, including that Guardian had been "providing the [Twins] with a loving and stable home" where the Twins had their own rooms. (Appellants' App. p. 81). The trial court further noted that the Twins had already "resided in [Guardian's] home for [one and one half] years. This is the only stable home they have ever known. The [Twins] are bonded to [Guardian]. They are living in a healthy environment." (Appellants' App. p. 82). The record includes additional evidence in support of the trial court's decision, including that Guardian was actively trying to become a mother through adoption when she was made aware of Mother's situation. In the preceding year, the Special Needs Adoption Program had already approved her application for up to two children. Also, the GAL testified that the Twins "are so very well adjusted. They are receiving excellent services. They are surrounded by a . . . strong network of friends and family . . . . [T]hey are very well adjusted two and a half year olds. I do believe it is in their best interest . . . to remain where they are." (Tr. pp. 273-74).

Grandmother now contends that "[t]he trial court ignored both parents' indications that they would accept [Grandmother] as the [T]wins' adopted mother" and failed to

20

"weigh [Grandmother]'s familial connection" in determining the Twins' best interests. (Grandmother's Reply Br. p. 8; Grandmother's Br. p. 21). We note that our court has previously held that a "[b]lood relationship, while a material factor, is not controlling. . . . Relatives have no preferential legal right to adopt." *In re Adoption of Childers*, 441 N.E.2d 976, 980 (Ind. Ct. App. 1982). Rather, the trial court has complete discretion to consider some factors as more persuasive than others in determining that the Twins' best interests were better served through adoption by Guardian than by Grandmother. Grandmother's arguments amount to a request of this court to reweigh those factors, which we will not do. Therefore, we find that there is sufficient evidence that Guardian's adoption is in furtherance of the Twins' best interests.

### CONCLUSION

Based on the foregoing, we conclude that the trial court did not err in concluding that Father's consent to the Twins' adoption was not required. Neither did the trial court err in denying Grandmother's petitions to adopt the Twins, nor did it abuse its discretion in denying Grandmother's petitions to remove Guardian as guardian in exchange for her own appointment because the evidence is sufficient to establish that it is in the Twins' best interests to be adopted by Guardian.

Affirmed.

VAIDIK, C. J. and MAY, J. concur