## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 12 2015, 10:05 am
CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Mark R. Ramsey
Ramsey Law Office
Tell City, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Christine Redelman
Deputy Attorneys General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In the Matter of the Guardianship of K.E.H.

S.A.K.,

*Appellant-Petitioner,*

v.

Indiana Department of Child Services,

*Appellee-Respondent.*

February 12, 2015

Court of Appeals Case No. 19A01-1407-GU-305

Appeal from the DuBois Circuit Court

The Honorable William E. Weikert, Judge

Cause No. 19C01-1308-GU-17

**Kirsch, Judge.**

[1] S.A.K. ("Grandmother") appeals the trial court's denial of her request for permanent guardianship of K.E.H., raising two issues for our review, which we restate as:

> I. Whether the trial court erred by not making detailed findings of fact in its order; and

> II. Whether the trial court's decision to deny Grandmother's request for guardianship was in error.

[2] We affirm.

## Facts and Procedural History

[3] K.E.H. was born in April 2013. His parents are A.N. ("Mother") and R.H. ("Father"), and Grandmother is K.E.H.'s. paternal grandmother. Grandmother was present at the hospital when K.E.H. was born, and she was with him all that day and the next. At the time of K.E.H.'s birth, illegal drugs were present in his system, and Mother tested positive for drugs. Approximately twelve hours after K.E.H. was born, he was removed by the DuBois County Indiana Department of Child Services ("DCS") as being a "drug exposed infant," and DCS filed a child in need of services ("CHINS") petition. *Tr.* at 8.

[4] Days after K.E.H.'s removal from parents, Grandmother asked DCS family case manager Crystal Noble ("FCM Noble") for grandparent custody. DCS investigated Grandmother's home as a possible placement for K.E.H., and Grandmother and her husband completed and passed background checks.

However, Grandmother's other adult son ("Uncle") was living at Grandmother's home at the time, and he failed to submit to a background check. K.E.H. was placed with unrelated foster parents, with whom he has remained during the pendency of this guardianship proceeding.

[5] On August 15, 2013, Grandmother filed her pro se petition for appointment as permanent guardian of K.E.H. Mother and Father each provided a written consent to Grandmother being appointed K.E.H.'s guardian, and the consents were attached to the petition. As of the time Grandmother filed her petition, Uncle still had not completed a background check, and he was on house arrest and facing criminal charges. At an August 19, 2013 preliminary hearing on the guardianship petition, the attorney for DCS objected to any change of placement without further investigation and asked that K.E.H. remain in foster care, "where [K.E.H.] has bonded to the foster parent." *Id*. at 4. The trial court recognized that consents to the guardianship had been signed by both parents, but expressed concern:

> I find it somewhat concerning that [Father] has failed to participate for a long time, although he agrees to the guardianship. [Mother] has tested positive since July several times, and she consents. My first inclination is to appoint a guardian ad litem, who would represent the child, and would do an investigation . . . ."

*Id*. The trial court set the matter for a pretrial hearing in November 2013, and it later appointed attorney Beth Hatfield-Luff as guardian ad litem ("the GAL").

[6] After conducting her investigation, the GAL filed her confidential report with the trial court on October 30, 2013. The GAL's report found no areas of concern with Grandmother, her husband, or their home. Her recommendation was that Grandmother's guardianship petition be granted, provided that there would be a transition period allowing K.E.H. time to bond with Grandmother and her husband (collectively, "Grandparents") and get used to their home. There was also a provision that "there be absolutely no contact supervised or otherwise between [K.E.H.] and Mother and Father." *Appellant's App*. at A19. She also recommended that if Uncle did not take and pass the background check, that he be required to relocate before K.E.H. begin visits at Grandmother's home.

[7] At the November 4, 2013 preliminary hearing, there were discussions about the lack of progress with both parents and testimony regarding the parents' drug use and failure to comply with DCS. Mother testified that she was unwilling to participate with DCS, asserting they had treated her badly and that she did not "believe in [the system] anymore." *Tr*. at 11. Counsel for Father indicated that Father also harbored distrust for DCS stemming from its lack of communication. At that hearing, Grandmother, who was not yet represented by counsel, requested visitation with K.E.H., and stated that Uncle was no longer living at her residence. The trial court denied the visitation, explaining, "I would like to . . . have a little more information about your home," and that DCS would be making visits on occasion, to which Grandmother had no

objection. *Id*. at 17. Mother hired counsel who filed an appearance on November 25, 2013.

[8] At a December 16, 2013 hearing, intended to serve as a combination of a pretrial hearing on the guardianship and a review hearing on the CHINS case, it was noted that the GAL report came back favorably to the guardianship petition, and the DCS attorney Paul Schneider ("Schneider") indicated that "so long as [Father] is not residing with Grandmother, DCS did not object to the guardianship. *Id*. at 19. However, an unnamed DCS caseworker that was present at the hearing voiced concern to the trial court about moving forward with the guardianship. She noted that Grandmother did not know K.E.H., and she also indicated her concern that Father and Mother had been involved in a domestic dispute and that either or both were being evicted from their home and that Father might move back to Grandmother's home. Because not all parties and counsel were present, the trial court reset it for another pretrial hearing on January 27, 2014, noting "I want to see people and lawyers before I start granting guardianships under these circumstances." *Id*. at 22.

[9] At the January 27, 2014 pretrial hearing, the trial court recognized that an involuntary parental termination proceeding against parents had commenced and was pending, with adoption as the current permanency plan. The trial court noted its continued reservations about whether, if a guardianship were granted, Father would be involved with K.E.H. "more than he should be" because of his relationship to Grandmother. *Id*. at 23-24. Contrary to what DCS attorney Schneider had reported at the December hearing, the current

DCS position, according to the DCS attorney present at the hearing, Kayla McBride, was that DCS opposed the guardianship and desired a contested hearing. The trial court then set the matter for contested hearing in March 2014.

[10] At the two-day hearing, held in March and continued to June 2014, the parties each presented multiple witnesses, including the GAL, Grandmother, her husband, Mother, two DCS case managers and the CASA. The GAL's report was admitted into evidence. According to the GAL, the house was clean, Grandmother had a separate bedroom prepared for K.E.H., there was a car seat, and Grandmother had "baby-proofed" the house as the GAL had requested, including by adding smoke detectors, baby gates, and fire extinguishers. *Tr.* at 37. The GAL testified that Grandmother and her husband were "consistent," having been married for sixteen years and having lived in their home for over ten years, and maintained stable employment. *Id.* at 39. Grandmother also made plans for daycare for K.E.H.

[11] Grandmother and her husband also testified at the hearing. She reported that Uncle had moved out of her home in November 2013 and was believed to be on house arrest at the present time. Grandmother agreed that it would be in K.E.H.'s best interest if neither parent had any contact with K.E.H., and she testified that she "absolutely" would comply with any order that precluded contact between the parents and K.E.H. *Id.* at 51. Her husband likewise agreed to abide by any such condition. Both of them stated that they would call authorities if either parent came to the home. Grandmother noted that she did

not have, and has not had, a good relationship with Father, and that in the ten years she lived at her home, he had only been there a couple of times. Grandmother testified that she wanted K.E.H. to be with family, rather than a foster family. She was in agreement to having a transitional period during which visitations might be supervised by DCS. Upon cross-examination, Grandmother advised that she was fifty years old and that she had previously been a foster parent for Uncle's two children, before they left the state with their mother.

[12] Mother testified and reported that she was not stable enough to care for K.E.H. and that Grandmother was the only family member that could properly care for him. She stated that she was "perfectly fine" with having no contact with K.E.H. and would comply with a court order to have no contact with him. *Id.* at 74. As of the time of the hearing, Grandmother and her husband planned to file for adoption of K.E.H., but had not done so yet due to the legal costs. Mother testified that she would agree to that adoption.

[13] Two DCS case managers and the CASA testified on behalf of DCS. The case manager first assigned to the case, FCM Noble, confirmed that Grandmother requested custody early on in the case, but placement could not occur at that time because Uncle had not completed the necessary background check. DCS family case manager Shannon Blaize ("FCM Blaize") took over the case from Noble in June or July 2013. She met with Grandmother at her house in November 2013, and she did not observe anything about the residence that gave her concern about its appropriateness as a residence for K.E.H. She also

testified that Grandmother had exercised a visitation with K.E.H. and that it went well. FCM Blaize expressed concern, however, about the parents' possible association with K.E.H. if Grandmother were to be awarded guardianship. She opined that it was not realistic that Grandmother would cut off contact with Father, and "I have a hard time believing that she will call the police on her own son." *Id*. at 81. She noted the difficulty that would be associated with monitoring the situation. FCM Blaize characterized the parents as being untrustworthy, and expressed skepticism that Grandmother had no contact with Father as she had reported, when Grandmother evidently was able to contact Father and gain his signature on the consent to the guardianship. She also testified that on at least one occasion Grandmother had informed DCS that Uncle had left the home, but then DCS discovered he was still living there. FCM Blaize testified that she was concerned that Grandmother and her husband could not keep K.E.H. safe in terms of the parents' potential continued contact with K.E.H. Her conclusion was that it was in K.E.H.'s best interest to remain in foster care, where K.E.H. was "doing amazing." *Id*. at 92.

[14] CASA Laura Buck ("CASA Buck") likewise testified that she had concerns with the guardianship, with her focus being the safety of K.E.H. She opined that, while Grandmother and her husband are nice people, it would not be safe for K.E.H. to be in Grandmother's home under the constant "threat" of police involvement, referring to the fact that Grandmother or her husband would have to contact law enforcement every time either of the parents – one of whom was Grandmother's son – came to the house, as this would disrupt K.E.H.'s

happiness and security. *Id*. at 102. Her opinion was that it was not in K.E.H.'s best interest to grant the guardianship.

[15] The trial court took the matter under advisement, but on that same day, the trial court denied Grandmother's petition by order stating, "The Petition for Appointment of Permanent Guardianship Over the Person and Estate of Minor, filed August 15, 2013 is denied." *Appellant's App*. at A6. Grandmother now appeals.

## Discussion and Decision

[16] "All findings and orders in guardianship proceedings are within the trial court's discretion." Ind. Code § 29-3-2-4(a); *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1194 (Ind. Ct. App. 2014), *trans. denied*. Therefore, we will review the trial court's order for an abuse of discretion. *Adoption of J.L.J.*, 4 N.E.3d at 1194. An abuse of discretion occurs only when the decision of the trial court is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* In addition, we will give due regard to the trial court's ability to assess the credibility of witnesses. *In re Guardianship of J.K.,* 862 N.E.2d 686, 691 (Ind. Ct. App. 2007). We will not reweigh the evidence; instead, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

## I. Trial Court Order

[17] Grandmother argues that the trial court erred when it denied her request for permanent guardianship without entering special findings of fact and

conclusions thereon. Under Indiana Code section 29-3-5-3(a), if it is alleged and the trial court finds that the appointment of a guardian is necessary as a means of providing care and supervision of the person or property of a minor or incapacitated person, the trial court shall appoint a guardian. Subsection (c) provides that if the trial court finds that it is *not* in the best interest of the incapacitated person or minor to appoint a guardian, the court may:

> (1) treat the petition as one for a protective order and proceed accordingly;
>
> (2) *enter any other appropriate order*; or
>
> (3) dismiss the proceedings.

[18]     Ind. Code § 29-3-5-3(c) (emphasis added). While Indiana Code section 29-5-3-3 does not require that special findings be entered, there is an important and strong presumption that the child's best interests are ordinarily served by placement in the custody of the natural parent, and with that backdrop our Supreme Court has instructed trial courts to issue detailed and specific findings when a child is placed in the care and custody of a person other than the natural parent. *See In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002) (stating that generalized finding that placement other than with the natural parent is in child's best interest will not be adequate to support such determination). The special findings in this context serve "as a means of alerting parents of the reasons why their children are not being returned to their custody," thereby giving parents notice as to what steps they must take before their children will

be returned to them. *In re Guardianship of A.R.S.*, 816 N.E.2d 1160, 1161 (Ind. Ct. App. 2004).

[19] Here, Grandmother relies on *Guardianship of A.R.S.* to support her position that the trial court should have entered specific findings. In that case, a natural mother filed a petition to terminate the grandparents' guardianship of her two minor children, and the trial court denied the petition by simple order, without any specific findings. Mother appealed, arguing that, among other things, that special findings were required. A majority on the appellate panel agreed and extended the requirement that the trial court enter detailed findings to petitions to terminate guardianships. 816 N.E.2d at 1162-63. Judge Crone dissented, opining that once the threshold for guardianship is met, it is overly burdensome to require special findings upon denial of every petition for modification or termination, noting that if a parent desired special findings, he or she could request them under Indiana Trial Rule 52(A)).

[20] We find that *Guardianship of A.R.S.* is distinguishable from the facts before us. There, the natural parent petitioned to terminate the guardianship of her children and have them returned to her, and the trial court denied that request. In this case, the parents are not opposing the guardianship, as was the case in *Guardianship of B.H.*, nor are they seeking to terminate a guardianship and have their child returned to them, as was the case in *Guardianship of A.R.S.* Under the circumstances of this case, there is no need to "alert the parents why the child is not being returned to their custody." *Guardianship of A.R.S.*, 816 N.E.2d at 1161. In the absence of that need, we see no reason to extend the mandate

for specific findings to the facts before us, and as Judge Crone noted in his dissent, a party may ask for special findings, if desired, under Indiana Trial Rule 52(A). Because specific findings were not required under statute or case law, nor did either party request the entry of them, we conclude the trial court was not required to issue specific findings of fact in regard to the order denying Grandmother's guardianship petition. *See In re B.J.N.*, 19 N.E.3d 765, 769 (Ind. Ct. App. 2014) (where special findings were not required by paternity statute or rule, and no request for them was made, no error occurred from failure of trial court to make such findings).

## II. Denial of Guardianship

[21] Where, as here, the trial court did not enter specific findings of fact, nor was it required to, a general judgment standard applies. *In re B.N.J.*, 19 N.E.3d at 769. We may affirm a general judgment on any theory supported by the evidence at trial. *Id.* Because Grandmother had the burden of proof at trial and an adverse judgment was entered against her, she is appealing from a negative judgment. *See In re Matter of J.C.*, 735 N.E.2d 848, 849 (Ind. Ct. App. 2000) (where county office of family and children had burden of proof at trial and adverse judgment was entered against it). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion opposite that reached by the trial court. *Id.* We will reverse a negative judgment on appeal only if the decision of the trial court is contrary to law. *Id.* In determining whether a negative judgment is contrary to law, we neither reweigh the evidence nor judge the credibility of witnesses, and consider only the evidence most favorable to

the prevailing party, together with all reasonable inferences flowing therefrom. *Id.*

[22] We turn now to the trial court's decision to deny Grandmother's request for guardianship of K.E.H. The GAL's testimony and her report indicated that Grandmother's home was clean, appropriate, and prepared for K.E.H. and that Grandmother had arranged for daycare for him. The GAL recommended that the guardianship be granted, provided that Grandmother would agree to a transition period, so that K.E.H. could become acquainted with Grandparents, as well as agree to abide by a court-ordered restriction that K.E.H. have no contact with either parent. Grandparents both indicated a desire to have guardianship of K.E.H., and they testified that they would abide by any condition imposed that precluded contact between K.E.H. and his parents. They also stated that they would "call the law" if Father or Mother came to the house. *Tr.* at 57, 68. Mother likewise agreed to abide by a no-contact restriction on the guardianship.

[23] DCS, however, was concerned about the guardianship, even with the no-contact restriction. FCM Blaize testified that, given the relationships of the parties, it was "not realistic" that Grandmother could and would "cut off" contact with Father and call the police if he came to her home. *Id.* at 81. She felt that the arrangement would put K.E.H.'s safety at risk. CASA Buck opined that even if Grandparents did as they promised, and called the law enforcement if parents came to the home (or presumably came around K.E.H. at any location), this itself posed a "threat" to K.E.H.'s well-being, security, and

happiness. *Id*. at 102. FCM Blaize and CASA Buck each testified that she believed it was in K.E.H.'s best interest that he remain with his foster family, where he was placed at the time of his birth and with whom he has bonded.

[24] The record before us indicates that, from the beginning, DCS harbored concerns about the guardianship and that, during the course of the proceedings, those concerns developed into direct opposition to the guardianship. In part, the concerns were grounded in skepticism of Grandmother's truthfulness regarding whether and when Uncle was living at her home and her assurances that she did not have, and would not have in the future, contact with Father. To a greater degree, however, DCS's concerns appeared to be rooted in a distrust of Mother and Father, who were drug-addicted and unreliable, had a volatile relationship, and were being evicted from their home. Because of these characteristics, combined with the familial relationship to Grandmother, DCS believed that Mother and Father could not be trusted to abide by any no-contact restrictions that the trial court might impose on the guardianship. Contact or attempted contact by parents at Grandparents' home would result in repeated calls to law enforcement, thereby disrupting the safety and well-being of K.E.H. The trial court viewed the witnesses and assessed their credibility and determined it was not in K.E.H.'s best interest to grant the guardianship.

[25] Grandmother argues that she should have been given priority both because she is a relative and because the natural parents each signed a consent to the guardianship. Ind. Code §§ 31-34-4-2(a), 29-3-5-5(a)(4). She concedes, however, that "the key consideration in selecting a guardian for [K.E.H.] was

whether appointing [Grandmother] as [his] guardian was in the child's best interest." *Appellant's Br.* at 21 (citing Ind. Code § 29-3-5-5-(b), which states, "The court, acting in the best interest of the incapacitated person or minor, may pass over a person having priority and appoint a person having a lower priority or no priority under this section."); *see also* Ind. Code § 29-3-5-4(b) (court shall give due regard to best interest of incapacitated person or minor). Grandmother maintains that DCS provided no credible evidence that the guardianship would not be in K.E.H.'s best interest. *Appellant's Br.* at 21. We disagree; there was evidence presented that the guardianship was in K.E.H's best interest and evidence that it was not. That the evidence may have supported another outcome does not warrant reversal. Considering the evidence most favorable to the prevailing party, together with all reasonable inferences flowing therefrom, as we must, we cannot say that the trial court's decision to deny the guardianship petition was contrary to law.

[26] Affirmed.

Friedlander, J., and Crone, J., concur.