## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 08 2018, 5:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jane Ann Noblitt
Columbus, Indiana

ATTORNEY FOR APPELLEE

Jeffrey C. Rocker
Beck Rocker, P.C.
Columbus, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

T.M.,

*Appellant-Respondent,*

v.

B.S.,

*Appellee-Petitioner.*

February 8, 2018

Court of Appeals Case No.
03A05-1708-AD-1799

Appeal from the Bartholomew
Superior Court

The Honorable Kathleen Tighe
Coriden, Judge

Trial Court Cause No.
03D02-1701-AD-248

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent T.M. is the biological father of L.M. ("the Child"). T.M. concedes that he has had no contact with the Child since 2007. He nonetheless appeals from the trial court's order granting Appellee-Petitioner B.S.'s petition to adopt the Child. B.S. is the Child's step-father and is the only father the Child has ever known. On appeal, T.M. contends that the trial court erred in finding that his consent to the adoption was not necessary and that the adoption of the Child by B.S. was in the Child's best interests. Finding no error in the trial court's order, we affirm.

# Facts and Procedural History

[2] The Child was born on December 23, 2004. C.S. is the Child's biological mother and T.M. is the Child's biological father. Although the Child was born out-of-wedlock, T.M.'s paternity was established by a paternity affidavit. C.S. subsequently filed a paternity action. At the conclusion of this action, the trial court ordered that C.S. would have custody of the Child and T.M. would pay child support in the amount of $47.00 per week. The record reveals that T.M. soon feel into arrears of his child support obligation and that he has failed to make any payments toward this obligation since March of 2013.

[3] In 2008, T.M. was incarcerated for dealing cocaine. While incarcerated, on February 4, 2009, T.M. wrote a letter to the trial court asking the court to order C.S. to allow T.M.'s mother to bring the Child to the Branchville Correctional

Facility for visitation. The trial court acknowledged receiving T.M.'s letter and advised T.M. that the court would "not order visitation to a prison for a minor child without consent from the mother." 6/23/2017 Tr. Vol. II, p. 13. T.M. was released from incarceration in August of 2012.

[4] Following his release from incarceration, T.M. worked various jobs including stints at KFC, Wendy's, and McDonald's. He also worked in construction and maintenance. In August of 2014, T.M. was again incarcerated for violating the terms of probation and committing auto theft.

[5] C.S. married B.S. on July 31, 2010. They have two children together. B.S. is the only father figure that the Child knows and the Child considers B.S. to be her father.

[6] On January 12, 2017, B.S. filed a petition to adopt the Child. The trial court conducted a hearing on whether T.M.'s consent to the adoption was necessary on June 23, 2017. T.M. remained incarcerated as of the date of the June 23, 2017 hearing.

[7] During the June 23, 2017 hearing, T.M. admitted that he had neither seen nor spoken with the Child since 2007. He had never attempted to contact her via phone, in person, or by mail. He had never sent her Christmas or Birthday cards.

[8] On June 29, 2017, the trial court issued an order in which it found that T.M. (1) had abandoned the Child for at least six months prior to the date of the filing of

the adoption petition; (2) failed for a period of more than one year, without justifiable cause, to communicate significantly with the Child when able to do so; and (3) failed for a period of more than one year, without justifiable cause, to provide for the care and support of the Child when able to do so. Given these findings, trial court concluded that T.M.'s consent to the adoption was not necessary.

[9] On July 25, 2017, the trial court conducted a hearing on B.S.'s adoption petition. At the conclusion of the July 25, 2017 hearing, the trial court granted B.S.'s petition to adopt the Child.

# Discussion and Decision[1]

## I. Standard of Review

[10] "When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption." *In re Adoption of J.L.J. and J.D.J.*, 4 N.E.3d 1189, 1194 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*. We generally give considerable deference to the trial court's decision in family law matters, because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, "get a feel for the family dynamics," and "get a sense of the parents and their relationship with their children." *MacLafferty v. MacLafferty*, 829 N.E.2d 938,

---

[1] We acknowledge that B.S. argues that the motions panel of this court "should have denied T.M.'s 'Motion to Permit Deviation from the Indiana Rules of Appellate Procedure' and dismissed his appeal given the court's 'strong position against extensions in appeals of terminations of parental rights and adoptions.'" Appellee's Br. p. 11 (emphases omitted). However, given our preference to decide cases on their merits, we decline Appellee's invitation to revisit the issue and will instead issue a decision on the merits of the case.

940 (Ind. 2005). We will not disturb the trial court's ruling "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *Rust v. Lawson*, 714 N.E.2d 769, 771 (Ind. Ct. App. 1999) (citation omitted), *trans. denied*. The trial court's findings and judgment will be set aside only if they are clearly erroneous. *In re Paternity of K.I.*, 903 N.E.2d 453, 457 (Ind. 2009). "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* "We will neither reweigh the evidence nor assess the credibility of witnesses, and we will examine only the evidence most favorable to the trial court's decision." *In re Adoption of A.M.*, 930 N.E.2d 613, 616 (Ind. Ct. App. 2010).

*In re Adoption of O.R.*, 16 N.E.3d 965, 972–73 (Ind. 2014).

# II. Analysis

T.M. contends that the trial court erred in finding that (1) his consent to the adoption of the Child was not necessary and (2) the adoption was in the Child's best interests.

## A. Consent

Generally, a petition to adopt a child may only be granted if written consent to the adoption has been executed by "[t]he mother of a child born out of wedlock and the father of a child whose paternity has been established by … a paternity affidavit[.]" Ind. Code § 31-19-9-1(a). However, Indiana Code section 31-19-9-8(a) provides in relevant part:

> Consent to adoption … is not required from any of the following:
> (1) A parent or parents if the child is adjudged to have been

abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

As the Indiana Supreme Court has previously noted, Indiana Code section 31-19-9-8(a) "is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent." *In re Adoption of O.R.*, 16 N.E.3d at 973. Further, "[i]f a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent." Ind. Code § 31-19-9-8(b).

[13]     In concluding that T.M.'s consent was not required in this case, the trial court relied on all three of the above-mentioned statutory provisions. However, because we conclude that the trial court properly relied on at least one of the statutory provisions—that for a period of at least one year, T.M. failed without justifiable cause to communicate significantly with the Child although he was able to do so—we do not address the other provisions on which the trial court also relied. *See In re Adoption of O.R.*, 16 N.E.3d at 973 (providing that because the court concluded that the father had failed to communicate significantly with the child without justifiable cause and when able to do so, the court need not consider whether the trial court properly relied on the other statutory provisions included in the trial court's order).

[14] T.M. does not dispute that the Child was in the custody of another person for a period of at least one year. Rather he contends that he did not fail without justifiable cause to communicate significantly with the Child when able to do so. We disagree.

[15] By T.M.'s own admission, he has not had any contact with the Child since 2007. T.M. never attempted to communicate with the Child via telephone, either while incarcerated or not, despite the fact that he knew, or could easily have obtained, C.S.'s telephone number. In fact, although T.M. claimed that he believed that C.S. had changed her telephone number, C.S. testified that she has had the same telephone number since 2006. T.M. had previously communicated with C.S. at this number. However, since 2007, he never even attempted to call C.S. at the telephone number.

[16] T.M. claimed to have attempted to send C.S. one Facebook message, but asserted that he believed that C.S. had blocked him from contacting her on the social media platform. C.S. testified that she did not block contact from T.M. and that she did not recall ever receiving a message from T.M. However, even assuming that T.M. did send C.S. the alleged message, one attempt to make contact during a ten-year period falls far short of significant communication.

[17] T.M. admitted that he knew how to reach C.S.'s parents, but testified that he never contacted them to ask for information about how to reach the Child because his mother had told him not to. Specifically, T.M. claimed that his "mom asked [him] not to go to [C.S.'s] parents' house because she said it would

create problems and [the Child] didn't need [him] to create no problems for her." 6/23/2017 Tr. Vol. II, p. 46. T.M. chose not to attempt to reach the Child through her maternal grandparents. T.M. further indicated that he asked a mutual friend to reach out to C.S., but that the friend refused and "said he wasn't getting involved in that because he was friends with [C.S.] and he was friends with [T.M.] as well. He didn't want to put himself in that position." 6/23/2017 Tr. Vol. II, p. 45.

[18] In addition, T.M.'s older daughter[2] rode the same school bus and lived one-eighth of a mile from the Child. The record reveals that the two children had some form of relationship and spoke while on the bus together. It also reveals that T.M. had visited his older daughter at her home. T.M. maintains, however, that he did not know and had no way to find out where the Child lived.

[19] Further, it is undisputed that T.M. has been incarcerated for some of this ten-year period. T.M. admits that he has not attempted to write the Child a letter or to communicate with her in any other way while incarcerated. He asserts only that he sent a letter to the trial court during his 2008 to 2012 term of incarceration asking about potential visitation with the Child. Nothing in the

---

[2] T.M.'s older daughter has a different Mother than the Child. The instant adoption case has no bearing on T.M.'s continued relationship with this child.

record, however, indicates that T.M. reached out to anyone connected with the Child, *i.e.*, C.S. or C.S.'s family, at any time during his incarceration.

[20] T.M. offered a number of excuses for his failure to attempt to contact the Child. These excuses, however, do not justify his failure to communicate significantly with the Child. Further, T.M. has failed to prove that effort on his part would have been futile or that any attempts to communicate with the Child would have been rejected.

[21] Again, it is undisputed that T.M. has had no contact with the Child for over a decade of the Child's life. Given this fact and based on our review of the record, we conclude that there was clear and convincing evidence before the trial court that while the Child was "in the custody of another person [and] for a period of at least one (1) year [T.M.] … fail[ed] without justifiable cause to communicate significantly with [the Child] when able to do so." Ind. Code § 31-19-9-8(a)(2)(A). T.M.'s consent to the adoption of the Child was therefore not required.

## B. Best Interests of the Child

[22] "Even if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests." *In re Adoption of M.S.*, 10 N.E.3d 1272, 1281 (Ind. Ct. App. 2014). Here, the trial court found that the adoption was in the Child's best interests. This finding is supported by the fact that B.S. is the only father that the Child has ever known. C.S. testified that B.S. provides the Child with a stable home

environment. C.S. also testified that the Child wants nothing to do with T.M. and is scared of T.M. In addition, C.S. testified that she "[a]bsolutely" believed that the adoption was in the Child's best interests. 7/25/2017 Tr. Vol. II, p. 8.

[23] Even though he acknowledges that he has had no contact with the Child since 2007, T.M. maintains that "it's been [his] intent [to] try and maintain contact." 6/23/2017 Tr. Vol. II, p. 37. T.M. explained that he does not believe the adoption is in the Child's best interests

> [b]ecause I do love [the Child] a lot and I've not been in her life because I made some mistakes but she's got a choice, a chance, she should be able to know who her father is to [sic]. And I should be able to explain to her one day when she comes to me and ask [sic] why I ain't been there, why I messed up, and try to prove to her that I could be a good father.

6/23/2017 Tr. Vol. II, p. 42. T.M. further explained that

> [E]very kid deserves a chance to be with their dad. I never had my dad so I don't know what it's like to be a dad or be around a dad but I know that I love her and I know that I put other things before her and I know that I owe her an explanation why. I just don't want her to feel like I gave up on her.

6/23/2017 Tr. Vol. II, p. 44.

[24] Given that T.M. has not had any contact with the Child for approximately a decade, the Child already considers B.S. to be her father, B.S. and C.S. provide the Child with a stable living environment, and C.S. is in favor of the adoption,

we conclude that the trial court did not err in finding that adoption was in the Child's best interests.

# Conclusion

In sum, not only does the record support the trial court's conclusion that T.M.'s consent to the adoption of the Child was not required, it also supports the trial court's conclusion that B.S.'s adoption of the Child is in the Child's best interests. We therefore find no error in the trial court's order granting B.S.'s petition to adopt the Child.

The judgment of the trial court is affirmed.

Robb, J., and Crone, J., concur.