Joel WELLS, Intervenor, Appellant,

v.

The **GUARDIANSHIP OF** Myrtle Farley WELLS, Appellee.

No. 55A05–9910–CV–455.

Court of Appeals of Indiana.

July 20, 2000.

Dale S. Coffey, Boren & Oliver, Martinsville, Indiana, Attorney for Appellant.

Mark Peden, Foley Foley & Peden, Martinsville, Indiana, Attorney for Appellee.

## OPINION

**FRIEDLANDER, Judge**

When illness rendered eighty-eight-year-old Myrtle Farley Wells incapable of making decisions about her medical treatment and managing her estate, four of her eleven children filed a petition for the emergency appointment of a temporary guardian. The petition requested that June Coffey, one of Myrtle's daughters, be appointed in that capacity. Coffey was appointed permanent guardian in a subsequent proceeding. Joel Wells (Intervenor) is Myrtle's son and Coffey's brother. After Coffey was appointed temporary guardian, Intervenor opposed Coffey's appointment as either temporary or permanent guardian. Wells appeals Coffey's appointment as guardian, presenting the following restated issues for review:

1. Did the trial court err in appointing Coffey as temporary and permanent guardian?

2. Did the trial court err in approving placement of a mobile home on Myrtle's property?

We affirm.

The undisputed facts are that Myrtle lives in her home in Martinsville, Indiana. Intervenor lived with Myrtle in her house until approximately three years before these proceedings commenced. He thereafter moved to nearby Fruitdale, but did not give his address to Coffey. Although he moved out of his mother's house, he continued to list his mother's home address as his own. Myrtle was hospitalized in the summer of 1998 after experiencing the symptoms of a stroke. Physicians treating Myrtle informed her family that they believed Myrtle was then incapable of taking care of herself. When her condition became critical, one doctor told Julia K. Benson, Myrtle's daughter, that Myrtle might need a guardian "very, very soon", *Record* at 205, in order to make "some very critical medical decisions." *Id.* They suggested that the family should seek appointment of a guardian to make those

decisions. The doctors made it clear that time was of the essence by telling the children that Myrtle "probably was not going to make it, and that someone needed to be Guardian to make decision on whether or not to put her on life support." *Id.* at 211. According to Janet Colburn, one of Joel's sisters, Joel was present at the first meeting at which a physician informed the children that Myrtle should have a guardian appointed to act in her behalf. After hearing that information, Joel "immediately left the room." *Record* at 210. Joel did not attend subsequent meetings with Myrtle's treating physicians.

Pursuant to the doctors' advice, the other children present at the time went to the office of a nearby attorney and filed an emergency petition requesting that Coffey, the oldest daughter, be appointed guardian. Before going to the attorney's office, Colburn called all of Myrtle's children who lived out-of-state and informed them of their intention to seek the appointment of a temporary guardian for Myrtle. All of the ones contacted concurred in the proposed course of action. Colburn placed several phone calls from the hospital in an attempt to apprise Intervenor of the situation. At least one of those calls was to the phone number of Intervenor's business. Although Intervenor did not answer, Colburn left a message.

On a portion of the emergency petition, Coffey was asked to provide names and addresses, "as far as known or as can be reasonably ascertained, of those persons most closely related by blood or marriage" to Myrtle. *Record* at 98. In response to this question, Coffey listed only herself and three of her siblings, Colburn, Nancy Kelso, and Jack Wells.

On July 8, 1998, the trial court appointed Coffey temporary guardian and scheduled a September 11, 1998 hearing for the purpose of determining permanent guardianship. On September 8, Intervenor filed a motion for continuance upon grounds

that he and six other siblings[1] were not listed on the emergency petition for guardianship and were not aware of the proceedings. The matter was rescheduled and the permanent guardianship hearing was held on November 19, 1998.

Following the hearing, the trial court observed that it was obvious that the some of the siblings did not "get along." *Id.* at 335. As reflected in the following, the court appointed Coffey as guardian, but granted Intervenor certain rights:

> But I think as much by the numbers in the volume of the testimony the Court has to grant Guardianship to June Coffey. And will do so for the personal [sic] and the estate of Myrtle Wells. But I am specifically making Orders .. directing the Guardian as follows: Joel Wells shall have access to Myrtle, and Myrtle's medical reports and conditions [sic]. Joel shall have access that will be determined ultimately by the Guardian June Coffey. But, access will include opportunities to talk to Myrtle confidentially on the phone. To visit her at the home and have private conversations with her. The Guardian shall consider any request for .. as Mr. Wells put it .. a drive or a Sunday dinner. But it shall be the Guardian's ultimate and sole responsibility to determine if these requests are in the best interest of Myrtle. And that shall be the Guideline on those requests. Jerry Wells shall be allowed to move his

trailer onto the property .. onto a portion of Myrtle's property. But it shall not be hooked up to any of Myrtle's utilities. It can be hooked up to the septic only with approval of the Guardian and the Morgan County Health Office. No property shall be sold or transferred without Court approval. Joel, you and Nancy need to .. or you and June need to get together and make peace.

*Record* at 335–36. Intervenor appeals this ruling.

### 1.

Intervenor contends that the trial court erred in appointing Coffey first as temporary guardian and later as permanent guardian. The appointments were in error, Intervenor contends, because Coffey did not comply with the requirements of Indiana law in that she purposely omitted the names of some of her siblings from the emergency guardianship petition, and because she was not honest.

■ Intervenor contends that the trial court erred in appointing Coffey as temporary guardian because Coffey did not comply with the notice provisions contained in Ind.Code Ann. § 29–3–6–1 (West 1994).[2] Intervenor's argument in this regard misses the mark because that statute governs actions involving the appointment of per-

---

1. In addition to Intervenor, Coffey, Colborn, Kelso, and Jack Wells, Myrtle's other children are Johnse Wells, Julia K. Benson, Jerry Wells, JoAnne Dragoo, James C. Wells, and Joyce Glenn. There is also a reference in the record to a Kyle Wells, who is identified as a "stepson." *Record* at 36.

2. That statute states, in pertinent part:
 (4) If it is alleged that the person is an incapacitated person, notice of the petition and the hearing on the petition shall be given to the following persons whose whereabouts can be determined upon reasonable inquiry:
 (A) The alleged incapacitated person, the alleged incapacitated person's spouse, and the alleged incapacitated person's adult children, or if none, the alleged incapacitated person's parents.
 (B) Any person who is serving as a guardian for, or who has the care and custody of, the alleged incapacitated person.
 (C) In case no person other than the incapacitated person is notified under clause (A), at least one (1) of the persons most closely related by blood or marriage to the alleged incapacitated person.
 (D) Any person known to the petitioner to be serving as the alleged incapacitated person's attorney-in-fact under a durable power of attorney.
 (E) Any other person that the court directs. Notice is not required under this subdivision if the person to be notified waives notice or appears at the hearing on the petition.

manent guardianship, not temporary guardianship. The appointment of temporary guardianship is governed by IC § 29-3-3-4 (West 1994), which states, in pertinent part:

Sec. 4. (a) If:

(1) a guardian has not been appointed for an incapacitated person or minor;

(2) an emergency exists;

(3) the welfare of the incapacitated person or minor requires immediate action; and

(4) no other person appears to have authority to act in the circumstances;

the court, on petition by any person or on its own motion, may appoint a temporary guardian for the incapacitated person or minor for a specified period not to exceed sixty (60) days. *No such appointment shall be made except after notice and hearing unless it is alleged and found by the court that immediate and irreparable injury to the person or injury, loss, or damage to the property of the alleged incapacitated person or minor may result before the alleged incapacitated person or minor can be heard in response to the petition.* If a temporary guardian is appointed without notice and the alleged incapacitated person or minor files a petition that the guardianship be terminated or the court order modified, the court shall hear and determine the petition at the earliest possible time.

(Emphasis supplied.) The above provision requires notice, but does not specify what form the notice must take or to whom it must be given. It may be inferred from the portion of the statute highlighted in italics, however, that the subject of the guardianship is the person to whom notice must be given.

 We agree with Coffey's assertion that the lack of specific guidelines governing notice in IC § 29-3-3-4 indicates that the legislature intended to grant trial courts wide discretion in such matters in order to allow them to effectively deal with diverse and exigent circumstances. In fact, it is not surprising that the notice requirements are relaxed in view of the circumstances under which a temporary—or emergency—guardianship traditionally is sought. By definition, such guardianships are sought when time is of the essence and immediate action is required. Therefore, we conclude that the notice provisions of IC § 29-3-3-4 were met and trial court did not err in appointing Coffey as temporary guardian.

Intervenor contends that the trial court erred in appointing Coffey as permanent guardian on grounds that Coffey did not comply with the notice provisions of IC § 29-3-6-1, and that Coffey was dishonest in failing to notify Intervenor.

 Even assuming for the sake of argument that Coffey gave defective notice prior to the determination of permanent guardianship, Intervenor was not prejudiced thereby. The court conducted two hearings on the issue of permanent guardianship, and Intervenor was physically present at both and represented by counsel. Intervenor offers no authority for the proposition that the failure to comply with the notice requirements of IC § 29-3-6-1 automatically invalidates an appointment of permanent guardianship, and we find none. Moreover, we are reluctant to create such a rule, especially where the complaining party received sufficient notice to enable him to retain counsel and appear at all proceedings relative to the permanent guardianship.

Intervenor contends that, in addition to the alleged technical deficiencies in notifying him of the temporary guardianship proceedings, another reason the appointment was in error is that Coffey exhibited dishonesty in failing to notify him, as set out above. In framing the factual premise underlying his contention, Intervenor claims that Coffey "purposely omitted Joel Wells from notification requirements of the proceedings." Appellant's Brief at 13. Our review of the record reveals that the evidence was, at best, conflicting on this

point. We summarize below the evidence favorable to the appointment of Coffey as guardian.

Intervenor, Coffey, Colburn, Kelso, and Jack Wells, were present in a meeting at which a physician initially advised them that a guardian should be appointed for Myrtle. Intervenor left immediately after hearing that information. At some point, the siblings were informed that someone would have to make life-and-death decisions on their mother's behalf "very, very soon." *Record* at 205. After calling or attempting to contact the other eight siblings, Coffey, Colburn, Kelso, and Jack Wells went to a nearby attorney's office and arranged for an emergency hearing in order to appoint a temporary guardian. Colburn attempted to call Intervenor several times, and on a least one occasion left a message on his business's answering machine. Coffey explained that the reason she listed only the names of those present at the time the emergency petition was filed was because they were the only siblings for whom home addresses were known. Coffey knew Intervenor lived in Fruitdale, Indiana, but did not know his street address. In fact, Coffey had previously asked Intervenor for his address, but he refused to give it to her. Coffey specifically denied "hoping that the Guardianship was going to be established before [Intervenor] found out about it[.]" *Record* at 186. This evidence permits a reasonable inference that Coffey did not intentionally attempt to conceal the guardianship proceedings from Intervenor.

In summary, we conclude that Coffey complied with the statutory notice requirements set out in IC § 29–3–3–4 in petitioning for emergency temporary guardianship of Myrtle. Even if there was a deficiency in that regard with respect to the proceedings for permanent guardianship, Intervenor was not prejudiced thereby because he attended and fully participated in those proceedings. The evidence permits a reasonable inference that Coffey did not act dishonestly in omitting Intervenor's name from the petition for temporary guardianship, or in attempting to adhere to the notice requirements of IC § 29–3–3–4 and IC § 29–3–6–1, where applicable. Finally, we note that all of Myrtle's children except Intervenor consented to Coffey's guardianship and, apart from the matter discussed in Issue 2 below, there has been no allegation that Coffey failed to reasonably and adequately discharge her duties as guardian. Taken together, these factors lead us to conclude that the trial court did not err in appointing Coffey as Myrtle's permanent guardian.

2.

Jerry Wells owned and lived in a mobile home. Eviction proceedings had been initiated by the mobile home park on which his mobile home was located. At the time of the hearings to establish permanent guardianship, Jerry requested that he be allowed to move his mobile home onto Myrtle's property. Although Coffey was inclined to honor his request, Intervenor sought to limit her power to make that decision and the matter was presented to the court in the proceedings to establish permanent guardianship. The court granted Jerry Wells's request and Intervenor appeals that determination.

Intervenor contends that the decision to allow Jerry Wells to move the mobile home onto Myrtle's property contravenes IC § 29–3–8–1 (West 1994), which states:

> The guardian (other than a temporary guardian) of an incapacitated person is responsible for the incapacitated person's care and custody and for the preservation of the incapacitated person's property to the extent ordered by the court.

According to Intervenor, the court's decision to allow Jerry Wells to move his mobile home onto Myrtle's property was erroneous because it was not accompanied by a finding that the move would benefit Myrtle or her property.

Intervenor is correct in asserting that a guardian has a statutory duty to

manage the estate for the ward's best interest. *Id.; Alcon v. Koons,* 42 Ind.App. 537, 82 N.E. 92 (1907). "Best interest" in this context is not to be understood as exclusively synonymous with pecuniary gain. Decisions and actions that result in nonfinancial benefits to the ward would also qualify as being in the ward's best interest. Following are the comments of the court in announcing its decision to allow Jerry Wells to move his mobile home onto his mother's property:

> "And for this type of a situation in having a Caretaker's residence on the property does not sound like that bad of an idea to me. I don't care if it's a Pup-tent .. if somebody wants to live in it and they don't object to it .. it's not our position to object to it.... But if they want to move Jerry onto this property in a trailer to help care for Mom, I don't see that much of a problem ...."

*Record* at 250–51. The court's comments reflect its view that having someone living nearby would be of benefit to Myrtle. In view of Myrtle's advanced age and infirmity, the court did not err in finding that having a child nearby who could assist her and monitor her situation on a daily basis would benefit her. Although this benefit is not necessarily a financial one, it satisfies the statutory criterion that decisions made on Myrtle's behalf must be in her best interest.

We note also that the court was obviously mindful of the financial dimensions of its decision with respect to the mobile home. In that regard, the court clarified that the mobile home would not have "any deeded ground to it." *Record* at 250. The mobile home was not to be attached to the property in such a way as to make it difficult to move. Jerry Wells could not hook up to Myrtle's utilities, and he could only connect to her septic system with the approval of the Morgan County Health Department. Finally, the court clarified that the mobile home must be moved as soon as Myrtle no longer maintains her residence on the property.

We are satisfied that the court's decision to allow Jerry Wells to move his mobile home onto Myrtle's property, with the restrictions set out previously, was in her best interest.

Judgment affirmed.

NAJAM, J., and MATHIAS, J., concur.