


FILED

Jun 24 2024, 8:52 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Court of Appeals of Indiana

In the Matter of I.E. and A.E. (Minor Children), Children in Need of Services,

And

A.H. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services, and A.E. and J.E.,

*Appellees-Petitioners*

---

June 24, 2024

Court of Appeals Case No.
23A-JC-2399

Appeal from the Shelby Superior Court

The Honorable R. Kent Apsley, Judge

Trial Court Cause Nos.
73D01-2210-JC-38
73D01-2210-JC-39

**Opinion by Judge Kenworthy**
Judges May and Vaidik concur.

**Kenworthy, Judge.**

[1] A.H. ("Mother") appeals the trial court's order appointing permanent guardians for two of her daughters after the court adjudicated them Children in Need of Services ("CHINS") due to educational neglect. The trial court entered the guardianship order in the absence of a petition for guardianship and notice to Mother required by statute, then closed the CHINS proceedings. We find Mother did not receive due process of law, and so we reverse the guardianship and CHINS dismissal orders and remand for further proceedings.

## Facts and Procedural History

[2] Mother is the parent of I.E., born October 18, 2013, and A.E., born October 25, 2014 (collectively, "Children").[1] Children also have a younger half-sister, T.H., born to Mother in 2017. For about six years after A.E. was born, Children's paternal grandfather and his wife (collectively, "Grandparents") cared for Children under a court-ordered guardianship. But Children returned to Mother's care in 2020 after Grandparents voluntarily moved to dissolve the guardianship.

---

[1] Children's father, J.E., largely did not participate in the trial court proceedings and does not participate in this appeal.

[3] During the 2021-22 school year, Children attended their local public elementary school. I.E. was eight years old and in second grade. Seven-year-old A.E. was in a first-grade special needs classroom where she received life skills training and speech and occupational therapy.[2] The school system provided Children with bus transportation to and from school. Near the end of the school year in April 2022, the State charged Mother with two misdemeanor counts of violating Indiana's compulsory school attendance law.[3] As a result, the Shelby County Office of the Indiana Department of Child Services ("DCS") began investigating Mother for educational neglect. Its investigation showed I.E. was absent or tardy 131 of 164 days of the 2021-22 school year, and A.E. was absent or tardy 130 of 164 days.

[4] DCS initially offered Mother home-based case work and parenting education services under an informal adjustment. But after Children's attendance problems continued into the new school year, DCS alleged Children and T.H. were CHINS. The trial court adjudicated Children CHINS on December 27.[4]

[5] Under its dispositional order, the trial court awarded wardship of Children to DCS, and Children remained in Mother's home under DCS supervision. Among other things, the trial court ordered Mother to: keep all appointments

---

[2] A.E. has unique educational and medical needs due to a Down syndrome diagnosis.

[3] Ind. Code § 20-33-2-6 (2005). Mother eventually pleaded guilty to both counts.

[4] At the time, I.E. was nine years old and in third grade, and A.E. was eight years old and in second grade. The trial court did not adjudicate five-year-old T.H. a CHINS because school attendance in Indiana is not compulsory until age seven. *See* I.C. § 20-33-2-6 (2005).

with service providers; ensure Children were enrolled in and attending school; meet all Children's medical and mental health needs; make sure Children arrived to school on time every day; have an appropriate caregiver available when Children arrived home from school; notify the Family Case Manager ("FCM") by 8:00 a.m. any time Children missed the bus; take Children to the doctor when they missed school for a medical reason; and sign releases giving DCS access to Mother's medical records. DCS recommended a permanency plan of reunification.[5]

[6] For the rest of the 2022-23 school year, Mother struggled to comply with the trial court's orders. Mother said Children were often sick and unable to attend school. Providers reported Mother struggled to wake up in the morning and get Children on the bus, and she was easily distracted when performing daily tasks. But Children's attendance improved slightly compared to the previous school year. At the end of the year, DCS reported I.E. was absent or tardy seventy-five out of 175 days, while A.E. had 109 absences or late arrivals over the same time. I.E. passed standardized tests to move on to fourth grade.

[7] DCS also raised new concerns about Mother's ability to timely meet Children's medical needs because of the number of Children's doctor appointments Mother cancelled or missed. Still, A.E. had participated in a long-delayed

---

[5] Although DCS documents state the permanency plan is "reunification," Children were not removed from Mother's home. Throughout this opinion, we use the term "reunification" for consistency with the case records, but "reunification" here means to remain in Mother's care and custody.

swallow study and was "catching up" on missed appointments. *Appellant's App. Vol. 2* at 91. And both Children were overall healthy. After a periodic review hearing, the trial court ordered Mother to schedule and complete Children's medical appointments over the summer so they would not miss school in the fall. The court also ordered Mother to complete a psychological evaluation. The permanency plan remained reunification.

[8] Over the summer, Mother missed or rescheduled several of Children's doctor appointments, although I.E. received an important medical procedure. Mother did not attend her court-ordered psychological evaluation. In its next progress report, DCS recommended the permanency plan remain reunification. But at the review hearing, DCS's attorney requested a permanency hearing be scheduled shortly into the 2023-24 school year and Grandparents be appointed guardians "if these children aren't in school every day[.]" *Tr. Vol. 2* at 214. At the end of the hearing, the trial court stated, "I don't think ultimately, I'm going to make any . . . substantial changes in my prior order, simply order that Mom comply." *Id*. at 217. The trial court ordered DCS to set up the psychological evaluation and Mother to attend the appointment "without exception, without excuse, without continuance." *Id*. at 218. The trial court then orally adopted a concurrent permanency plan of guardianship, and warned Mother,

> if I don't see basically 100% compliance with that psych eval, compliance with the evaluation recommendation, zero days missed, zero days tardy, then I just don't see where in good faith I can really go forward with any other plan than to place the children in a situation where they're actually going to get to school regularly . . . .

*Id.* at 219. In its written order, the trial court ordered concurrent permanency plans of reunification and legal guardianship, stating the "projected date for finalization of the child's permanency plan is October 2, 2023." *Appellant's App. Vol. 2* at 117.

[9] On September 28, DCS filed a progress report prepared for the upcoming periodic review hearing on October 2. In the first month of school, I.E. was late one time and missed no days. A.E. had one excused absence because of illness and arrived late seven times, all before 9:00 a.m.[6] The report stated the DCS permanency plan was reunification with an expected permanency date of November 13. It also noted the court-ordered concurrent plan of guardianship. Under "Other Pertinent Information," DCS requested the trial court order guardianship with Grandparents due to I.E. getting herself up to go to school, A.E.'s tardiness, and A.E. missing one doctor's appointment. *Id.* at 130. But in the recommendations section, DCS recommended wardship continue with family preservation services and requested a review hearing in ninety days. It did not request Children's removal from Mother's home.

[10] On the morning of October 2, the trial court held a hearing docketed as a "Review Hearing." *Id.* at 13. Mother attended and Father did not. DCS

---

[6] According to school attendance records attached to DCS's report, two of the seven days "students weren't entered tardy in the system because the car rider line was backed up." *Appellant's App. Vol. 2* at 141. However, DCS included those days in their calculations of A.E.'s tardy occurrences.

acknowledged Children's attendance had improved.[7]  Mother had not completed her court-ordered psychological evaluation.  She drove from Shelbyville to Carmel to attend the appointment, but arrived one and one-half hours late and the provider cancelled the referral.  DCS's attorney orally requested "guardianship to be finalized with the children's paternal grandfather[.]"  *Tr. Vol. 2* at 230.

[11]  Grandparents were present and testified at the hearing.  Even though Grandparents were now divorced, they agreed to partner to care for Children as guardians.  Mother objected to the guardianship because "the whole reason that we are here is because of attendance and [I.E.] has missed no days.  [A.E.] has only missed 2 that have been excused and she went to the doctor each time and um, got a note and medication."  *Tr. Vol. 3* at 7.

[12]  At the end of the hearing, DCS's attorney argued for immediate placement with Grandparents, and asked the trial court to "give us a date for that guardianship hearing which won't take long."  *Id.* at 18.  Mother's attorney pointed to the progress Mother had made and asked for continued placement with Mother.  Over Mother's objection, the trial court granted DCS's request to immediately place Children with Grandparents.  The following exchange occurred:

---

[7] According to the FCM and the most recent school reports, I.E. missed no days and was tardy three times. A.E. had two excused absences for medical reasons and was late ten times (a number which again included the two excused tardies).

THE COURT: . . . I am ordering they be placed immediately with [Grandparents].

MOTHER: No.

THE COURT: Uh, and that they be appointed guardians in this matter as a permanency outcome. I'll schedule a hearing, um, [Attorney for DCS], how quickly can you get that piece of the paperwork together?

MOTHER: You guys are not taking my children! From me!

THE COURT: And um, let's do this today, [Grandparents], would you be available at 3:30?

*Id.* at 20. Grandparents agreed they could attend that afternoon.

The trial court then scheduled the guardianship hearing for 3:30 p.m., noting guardianship would be "the permanency plan in this case going forward." *Id.* The trial court also advised the school officials in attendance Children should not leave school with anyone but Grandparents because they "have been appointed guardian[.]" *Id.* at 21. The court concluded:

THE COURT: All right. If there's nothing further, I won't schedule any further hearings in the matter.

MOTHER: I need to know what . . .

THE COURT: unless requested.

MOTHER: I can do to fight this.

THE COURT: So, [Mother], in this case, again, I'm not your lawyer, I can't give you legal advice, [your attorney] is your attorney. As far as what your rights . . .

MOTHER: Okay. Can I deny this? Can I, can I . . .

THE COURT: (Indiscernible)

MOTHER: What can I do?

THE COURT: If, if you talk to [your attorney], he'd be in the best position to advise you of what your rights are and how to proceed. All right. That'll conclude today's hearing. Thank you all very much for being here.

*Id.*

[14] That afternoon, the trial court held a guardianship hearing under separate cause numbers. Guardianship petitions were not filed, and the trial court had not yet entered a written order on the permanency plan. Grandparents had only partially completed the guardianship registry information sheets. Neither Mother nor Father attended.

[15] Grandparents testified they would serve as guardians. They raised several questions about the CHINS process and permanency. The trial court explained the guardianships "[a]re being created to accomplish the Court's Permanency Order in the related [CHINS] cases" but "under the law permanent means unless and until the Court orders otherwise." *Id.* at 29, 30. Grandparents seemed confused about who represented their interests at the hearing.

Grandfather asked, "If [Mother] decides . . . to come contest something I don't have to . . . retain a lawyer every time she does that, do I?" *Id.* at 33. The trial court explained Mother could petition the court anytime and it was grandfather's decision whether to hire an attorney. DCS invited Grandparents to call DCS "before you'd go to that extent[.]" *Id.* The trial court chimed in, "That doesn't make [attorney for DCS] your lawyer." *Id.* at 34. Grandmother then asked whether "DCS is done with [Mother]" and "these 3 children," perhaps under the assumption T.H. was subject to guardianship. *Id.* The trial court responded, "[DCS] will be [finished]. They'll be filing a Motion to Dismiss as I understand it." *Id.* Grandmother also asked about Mother's parenting time, but DCS explained:

> Oh. She didn't come today. You're the guardians so, I guess if you guys don't agree with her, and she wants to file she can file and you'd have a hearing on it. Judge would have a hearing on it. But at this point the buck stops with you. You're just like the parent.

*Id.* at 28.

[16] The next day, October 3, the trial court entered an order under the guardianship cause numbers, finding guardianship with Grandparents was in "the best interest of each child." *Appellant's App. Vol. 2* at 205. The guardianship order did not address Mother's parenting time or provide for sibling visits with T.H. The trial court also issued two orders in the CHINS case, both dated October 3 and filed October 4. In an order approving the permanency plan, the trial court wrote it heard evidence "on the progress report for Permanency filed by DCS"

and "notification of the Permanency Hearing was properly served on all required persons[.]" *Id.* at 147. The trial court approved a permanency plan of guardianship with a projected finalization date of October 2, 2023—one day before the order.[8] On DCS's motion, the trial court also entered a separate order granting wardship termination and closing the CHINS cases.

## Petition for Guardianship Required

[17] Mother does not challenge the permanency plan order. Instead, Mother argues the procedure the trial court used to create the guardianship and appoint Grandparents guardians violated her due process rights. DCS contends Mother received due process. But as a threshold question, DCS also asks us to interpret Indiana Code Section 31-34-21-7.7, which gives the trial court authority to appoint a guardian when a CHINS permanency plan calls for it. *See* I. C. § 31-34-21-7.7 (2011). "For the sake of families and DCS going forward," DCS seeks guidance on the statutory procedures for opening a guardianship case arising out of a CHINS matter; specifically, whether a guardianship petition and formal notice are required. *Appellee's Br.* at 17.

[18] Matters of statutory interpretation present pure questions of law which we review *de novo*. *Matter of M.S.*, 140 N.E.3d 279, 282 (Ind. 2020). The best

---

[8] The order also stated Children were residing with Mother and "progressing well in said placement." *Id.* at 147. It is not clear whether this was a misstatement or typo on the trial court's part. Although inconsistent with the trial court's removal and guardianship orders, Mother had made substantial progress in getting Children to school, and "progressing well" is an objectively fair characterization of her progress.

evidence of legislative intent is the statutory language itself. *Cubel v. Cubel*, 876 N.E.2d 1117, 1120 (Ind. 2007). When interpreting a statute, we give the words used their plain and ordinary meaning and "consider the structure of the statute as a whole." *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016). We avoid interpretations that depend on selective reading of individual words and lead to irrational and disharmonizing results. *Id*. If faced with ambiguity, we determine and give effect to the legislative intent "as best it can be ascertained." *Id*. at 1196. We presume the legislature intended the statutory language "to be applied in a logical manner consistent with the statute's underlying policy and goals." *M.S.*, 140 N.E.3d at 282 (citation omitted).

[19] In a CHINS proceeding, DCS must complete a permanency plan for a child and seek court approval of the plan. I.C. § 31-34-21-5.7(b)(1)–(2) (2012). A permanency plan is the "intended permanent or long term arrangements for care and custody of the child" DCS or the trial court considers "most appropriate and consistent with the best interests of the child[.]" I.C. § 31-34-21-7.5(c)(1) (2020). Relevant here, a permanency plan may include the continuation of existing custodial care in the parent's home or appointment of a legal guardian. *Id*.

[20] If a juvenile court approves a permanency plan providing for the appointment of a guardian, the court "may appoint a guardian of the person and administer a guardianship for the child under [Indiana Code Article] 29-3." I.C. § 31-34-21-7.7(a) (2011). Article 29-3 is the section of the probate code concerning

guardianship and protective proceedings. Beyond this reference to the probate code, the CHINS statutes do not delineate procedures for opening a guardianship matter when a CHINS permanency plan calls for appointment of a guardian.

[21] Under the probate code, guardianship actions commence with the filing of a petition for guardianship. *See* I.C. § 29-3-5-1(a) (2019) ("Any person may file a petition for the appointment of a person to serve as guardian for . . . a minor[.]"). The probate code specifies the petition contents,[9] to whom and how notice of the petition and hearing on the petition shall be given,[10] and the notice form and contents. I.C. § 29-3-6-2 (2022). Among other things, the petition must state the reasons the guardianship is sought. I.C. § 29-3-5-1(a)(10) (2019).

[22] After the filing of a petition, the trial court "shall set a date for a hearing on the issues raised by the petition." I.C. § 29-3-5-1(c) (2019). The guardianship statutes require notice of the petition and the hearing to certain interested parties. I.C. § 29-3-5-1(b) (2019). Prior to appointing a guardian for a minor, it must be alleged, and the court must find, (1) the individual is a minor, and (2) the appointment of a guardian is "necessary as a means of providing care and supervision of the physical person" or property of the minor. I.C. § 29-3-5-3(a) (1989). And "before placing a child in the custody of a person other than the

---

[9] I.C. § 29-3-5-1 (2019).

[10] I.C. § 29-3-6-1(a)–(b) (2022).

natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002).

[23] Here, the trial court opened a guardianship matter without a petition for guardianship and without notice of the petition and hearing being given under the guardianship statutes. Because Indiana Code Section 31-34-21-7.7(a) refers only to "appointing" and "administering" a guardianship, DCS argues "the trial court reasonably read [the statute] to give authority to open a guardianship case independent of the specific requirements of the guardianship statutes." *Appellee's Br.* at 16–17. In other words, DCS suggests a trial court presiding over a CHINS case in which the permanency plan calls for guardianship may "open" the guardianship in the absence of a guardianship petition and notice.

[24] We disagree with DCS's reading of the statute. Under its interpretation, a trial court would bypass the provisions of Indiana Code Section 29-3-5-1 (filing of the petition; notice and hearing) and move directly to Section 29-3-5-3 (findings; appointment of guardian). But Indiana Code Section 31-34-21-7.7(a) incorporates by reference all of Article 29-3, not just those provisions dealing with appointment and administration of guardianships. Under the probate code, a trial court cannot appoint a permanent guardian until it has held a hearing, and it cannot hold a hearing until a petition has been filed and notice of the petition and hearing is given to interested parties. When we "consider the structure of the statute as a whole," *ESPN*, 62 N.E.3d at 1195, it is apparent

the filing of a guardianship petition and notice of the petition and hearing are statutory prerequisites for appointment of a permanent guardian of a minor. [11]

[25] This practice for guardianships arising from a CHINS permanency plan is consistent with the express provisions of the probate code. For example, a guardianship petition must state whether a CHINS petition has been filed regarding the minor "and, if so, whether the case regarding the minor is open at the time the guardianship petition is filed." I.C. § 29-3-5-1(a)(13) (2019). The statute also requires the trial court to notify DCS of a guardianship hearing if a CHINS petition has been filed regarding the minor or a program of informal adjustment is pending. I.C. § 29-3-5-1(g) (2019). In that case, it gives DCS the right to participate in the hearing. *Id*.

[26] DCS points us to no authority to support its argument that a trial court may dispense with the probate code procedures for initiating guardianships resulting from CHINS permanency plans, and we have found none. DCS also admits its own "best practices" are for "the trial court and parties to comply with Indiana Code article 29-3 when opening any guardianship case [and] when appointing and administering a guardianship resulting from a permanency plan change in

---

[11] There are some statutory exceptions to the petition and notice requirements, but none are applicable here. For example, in an emergency, the court may, on a petition *or its own motion*, appoint a temporary guardian for ninety days. I.C. § 29-3-3-4 (2018) (emphasis added). In that case, the relaxed notice requirements may apply if certain conditions are met. *See id*. As this Court has previously observed, "it is not surprising that the notice requirements are relaxed in view of the circumstances under which a temporary—or emergency—guardianship traditionally is sought. By definition, such guardianships are sought when time is of the essence and immediate action is required." *Wells v. Guardianship of Wells*, 731 N.E.2d 1047, 1050 (Ind. Ct. App. 2000), *trans. denied*.

the CHINS case." *Appellee's Br.* at 16. In these cases, a guardianship petition can and should be filed.

[27] Our reading of the statute tracks other procedures to achieve permanency for children adjudicated CHINS. For example, to initiate a termination of parental rights ("TPR") proceeding following a CHINS adjudication, an attorney for DCS, the child's court appointed special advocate, or the child's guardian *ad litem* must file a petition with the trial court. I.C. § 31-35-2-4(a) (2024). Like the probate code, the TPR statutes prescribe the form and contents of the petition and require formal notice of a TPR hearing. I.C § 31-35-2-4 (2024); I.C. § 31-35-2-6.5 (2012). And while the TPR proceedings progress, the CHINS case continues in tandem until permanency is achieved or the objectives of the dispositional decree are met. *See Matter of A.Q.*, 104 N.E.3d 628, 635 (Ind. Ct. App. 2018) (observing "changes to the permanency plans do not terminate reunification services" and "[r]egardless of the time it takes for the termination proceeding to be completed, [parents] are able to participate in services and make the necessary progress to regain custody of their children."), *trans. denied*; I.C. § 31-34-21-11 (1997) ("When the juvenile court finds that the objectives of the dispositional decree have been met, the court shall discharge the child and the child's parent, guardian, or custodian.").

[28] In sum, when the permanency plan for a child adjudicated a CHINS provides for appointment of a guardian under Indiana Code Section 31-34-21-7.7, the

filing of a guardianship petition and notice of the petition and hearing are statutory prerequisites for appointment of a permanent guardian.[12]

## Mother Did Not Receive Due Process

[29] As the courts of this State have often observed, a parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quotation omitted). And the parent-child relationship is one of the most valued relationships in our culture. *See In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). Although parental rights are not absolute, *see R.S.*, 56 N.E.3d at 628, parents' liberty interest in the care, custody, and management of their child "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982)).

[30] CHINS proceedings "carry a significant potential to interfere with the rights of parents in the upbringing of their children." *Matter of Eq.W.*, 124 N.E.3d 1201, 1209 (Ind. 2019) (citation and quotation marks omitted). "Accordingly, due process concerns at all stages of a CHINS proceeding are of paramount concern." *Id.* "Due process requires 'the opportunity to be heard at a

---

[12] In this situation, petitions for guardianships should be filed in the juvenile court. While a CHINS proceeding is pending, both the probate and juvenile codes confer on the juvenile court exclusive original subject matter jurisdiction over guardianship proceedings resulting from a CHINS permanency plan. *See* I.C. § 29-3-2-1(c) (2023); I.C. § 31-30-1-1(a)(10) (2023). Here, the trial court with jurisdiction over the CHINS matter heard both cases.

meaningful time and in a meaningful manner.'" *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

[31] In the context of CHINS proceedings, due process "is so vital because 'procedural irregularities . . . in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights.'" *Id.* at 1258 (quoting *In re J.Q.*, 836 N.E.2d 961, 967 (Ind. Ct. App. 2005)). The CHINS statutes define a legal guardian appointed under a CHINS permanency plan as follows:

> (D) Appointment of a legal guardian. The legal guardian appointed under this section is a caretaker in a judicially created relationship between the child and caretaker that is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child:
>
>> (i) Care, custody, and control of the child.
>
>> (ii) Decision making concerning the child's upbringing.

I.C. § 31-34-21-7.5(c)(1)(D) (2020). Permanent guardianship created as the result of a CHINS permanency plan therefore represents a threat to natural parents' fundamental liberty interest in the care, custody, and management of their children. Because of the fundamental rights at stake, due process is critical in such proceedings as well.

[32] Under the probate code, when a petition for guardianship of a minor is filed, "notice of the petition and the hearing on the petition shall be given through the

E-filing System of the Indiana Courts or by first class postage prepaid mail[.]" I.C. § 29-3-6-1(a) (2022). Among others, any living parent of the minor shall be given notice. I.C. § 29-3-6-1(a)(3)(B). If a CHINS petition has been filed regarding the minor, or a program of informal adjustment is pending, DCS is also entitled to notice of a guardianship hearing. I.C. § 29-3-5-1(g) (2019). The probate code prescribes the notice's contents, which include: the date, time, and place of the hearing; the hearing's purpose; a copy of the petition; the name(s) of the proposed guardian(s), if any; and an advisement the court may limit the powers and duties of the guardian. I.C. § 29-3-6-2 (2022). Notice is not required only if the person to be notified waives notice or appears at the hearing on the petition. I.C. § 29-3-6-1(a) (2022).

[33] Here, during the CHINS review hearing in the morning, the trial court informed Mother it would hold a permanent guardianship hearing mere hours later in the as-of-yet unopened guardianship cases. By the afternoon hearing, guardianship petitions had not been filed. Grandparents only partially completed the guardianship registry information sheets; the "Close Relatives (Entitled to Notice)" sections were blank. *Appellant's App. Vol. 2* at 200–01, 212–13. Father had not attended the earlier CHINS review hearing and no efforts were made to notify him. Neither Mother nor Father appeared at the guardianship hearing.

[34] Although the trial court orally informed Mother of the afternoon hearing, Mother did not receive the formal notice due to her under the statute. Mother received no copies of the guardianship petitions, which were never filed. And

she received no formal notice of the hearing on the petitions. As a general principle, "if the State imparts a due process right, then it must give that right." *A.P. v. Porter Cnty. Off. of Fam. & Child.*, 734 N.E.2d 1107, 1112 (Ind. 2000). And because the trial court held the guardianship hearing mere hours after changing the permanency plan and ordering Children immediately removed from her care, Mother had no meaningful opportunity to retain counsel, prepare for the guardianship hearing, and present evidence and argument on her behalf.

[35] The confusion created by the procedures used here underscores the need for due process. At the guardianship hearing, Grandparents seemed unaware they were appearing *pro se*, but were instead under the impression counsel for DCS represented their interests. Grandmother asked about DCS's involvement with "these 3 children," apparently assuming Children's younger sister T.H. was also subject to guardianship. Grandparents presented no evidence on how they would share custody and care of Children despite being divorced and living separately. Although Grandmother raised the issue of visitation, the trial court in its order did not make provisions for parenting time for Mother or consider the impact of Children's separation from T.H.

[36] DCS nevertheless argues Mother received due process because she received notice and had an opportunity to be heard earlier in the day at the CHINS review hearing. We disagree for two reasons.

[37]     First, CHINS and guardianship proceedings are distinct, much like CHINS and TPR proceedings are distinct. *See* I.C. § 31-35-2-2 (1997) (TPR proceedings "are distinct from proceedings under IC 31-34 [CHINS.]"); *Hite v. Vanderburgh Cnty. Off. of Fam. & Child.*, 845 N.E.2d 175, 182 (Ind. Ct. App. 2006) ("[A]lthough termination proceedings and CHINS proceedings have an interlocking statutory scheme . . ., CHINS proceedings are separate and distinct from involuntary termination proceedings because a CHINS cause of action does not necessarily lead to an involuntary termination cause of action."). Indiana Code Article 31-34 governs CHINS proceedings, while guardianship proceedings fall under the probate code. Therefore, we cannot say as a general matter a trial court may dispense with the due process protections afforded by the probate code in a guardianship proceeding because a party received adequate due process in a CHINS review hearing.

[38]     Second, under the facts of this case, we cannot say the procedures followed in the CHINS matter obviated the need for due process in the guardianship case. Before the October 2 CHINS review hearing, Mother had made substantial progress in getting Children to school; neither Child had an unexcused absence during the two months school had been in session. Mother attended the review hearing without knowledge DCS planned to request Children's immediate removal from her home. DCS's progress report filed on September 28 stated the DCS permanency plan was reunification with an expected permanency date of November 13. It also noted there was "a concurrent plan of guardianship ordered by the court on 8/7/2023." *Appellant's App. Vol. 2* at 129. In one

section, DCS requested guardianship with Grandparents; but elsewhere, DCS recommended wardship continue with a goal of family preservation, did not request removal from Mother's home, and asked for another review hearing in ninety days. Only at the review hearing did DCS orally request guardianship be "finalized," in conflict with its reported expected permanency date of November 13. *Tr. Vol. 2* at 230. Mother thus entered the review hearing with mixed messages from DCS. And although the trial court warned Mother of the possibility of future removal, the October 2 hearing was docketed as a review hearing, not a permanency hearing.[13] Under these facts, we decline DCS's invitation to find Mother received adequate notice and opportunity to be heard on the guardianship matters because she was present and testified at the CHINS review hearing.

[39] Finally, DCS argues strict compliance with the guardianship notice provisions was unnecessary to provide Mother with due process. DCS points to cases that have found "no authority for the proposition that the failure to comply with the notice requirements of [Indiana Code section] 29-3-6-1 automatically

---

[13] Mother does not challenge the trial court's order approving the permanency plan. But we also note it contains inconsistencies with the CHINS procedural history leading up to the review hearing. The permanency order states the trial court heard evidence on "the progress report for Permanency filed by DCS." *Appellant's App. Vol. 2* at 147. But DCS filed a progress (not permanency) report, and the trial court had not scheduled a permanency hearing. The trial court's order also states notice of the "Permanency Hearing" was served under Indiana Code Section 31-35-2-6.5 (notice of TPR hearings), rather than Section 31-34-21-4 (notice of CHINS review hearings, including permanency hearings). *Id*. It appears the trial court *sua sponte* converted the review hearing into a permanency hearing. Although review and permanency hearings require the same notice under the CHINS statutes, *see* I.C. § 31-34-21-4(C) (2019) & I.C. § 31-32-1-4 (2007), a permanency hearing requires the trial court to make specific determinations. *Compare* I.C. § 31-34-21-2 (2008) (periodic case review) *with* I.C. § 31-34-21-7 (2024) (permanency hearing).

invalidates an appointment of permanent guardianship." *Appellee's Br.* at 23 (quoting *Wells*, 731 N.E.2d at 1050). We find *Wells* and its progeny distinguishable from this case. In *Wells*, the probate court appointed a woman as her mother's temporary, then permanent, guardian. *Id*. at 1049–50. Her brother complained the appointment was invalid because he did not receive notice under the guardianship statutes. *Id*. at 1050. Even so, the brother received sufficient notice to appear with retained counsel at both guardianship hearings before the permanent guardian's appointment. *Id*. Therefore, the *Wells* Court declined to set aside the guardianship order for lack of notice. *Id*. Unlike the brother in *Wells*, Mother did not receive meaningful notice of the guardianship hearing and an opportunity to retain counsel. More importantly, *Wells* does not concern the fundamental liberty interests at stake in this case.

[40] Here, the trial court's rushed appointment of a permanent guardian without statutory notice to either parent and meaningful opportunity for Mother to be heard did not satisfy due process. Accordingly, we reverse the trial court's order appointing Grandparents permanent guardians of Children.[14] *See, e.g., K.D.*, 962 N.E.2d at 1260 (reversing trial court's order adjudicating a child a CHINS for lack of procedural due process).

---

[14] Because we hold Mother did not receive due process, we do not address her argument the trial court failed to establish personal jurisdiction over her before entering the guardianship order.

## Conclusion

When a CHINS permanency plan calls for appointment of a permanent guardian of the minor, a guardianship petition and notice of the petition and hearing are required before the guardian is appointed. In this case, because no guardianship petition was filed and Mother did not receive notice of the petition and hearing required under the probate code, we reverse the guardianship order. And because the trial court's order dismissing the CHINS depended on achieving permanency, we reverse the wardship termination and CHINS dismissal order and remand for proceedings consistent with this opinion.

Reversed and remanded.

May, J., and Vaidik, J., concur.

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEES

Theodore E. Rokita
Indiana Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana